PHILIP C. DYRENFORTH *et al.* Appellees, *vs.* THE PALMER
    PNEUMATIC TIRE COMPANY, Appellant.

*Opinion filed April 23, 1909.*

1. CONTRACTS—*effect where a compromise agreement is made.*
If there is a dispute between the parties respecting their original
contract and they voluntarily enter into a compromise agreement,
it is not pertinent, in a suit on the compromise agreement, to go
back of it and inquire into the merits of the contentions of the par-
ties as to the original contract.

2. SAME—*when a contract is one of sale and not a license to
manufacture.* A contract whereby one company purports to "sell,
assign, set over and transfer" all of its patents and property to an-
other company, which is to pay a stipulated total price in quarter-
yearly payments, is not changed from a contract of sale to a license
to manufacture under the patents because there is a provision for
releasing the purchaser from further payments if certain of the
patents are held invalid as the result of pending litigation.

3. ATTORNEY AND CLIENT—*an attorney is not incapacitated from
contracting with client.* While a court of equity will closely scru-
tinize all dealings of an attorney with his client, and will, when
such contract is called in question by the client, cast upon the at-
torney the burden of showing by satisfactory evidence that the con-
tract was fairly and intelligently entered into by the client, yet the
relation of the parties does not absolutely incapacitate the attor-
ney from contracting with his client.

4. STATUTE OF FRAUDS—*when letter of acceptance is sufficient
signing of the contract.* A letter acknowledging the receipt of the
draft of a contract, and stating that the contract is all right except
that it is not clear as to a certain particular of the agreement but
that it will be "fixed" and returned to the other party, is a sufficient
signing of the contract to meet the requirement of the Statute of
Frauds respecting oral contracts not to be performed within one
year from the making thereof.

5. SAME—*part performance takes contract out of the Statute of
Frauds.* A contract for the payment of commissions out of pay-
ments made under a contract of sale, which are to extend over a
period of more than ten years, is taken out of the Statute of Frauds
by the mutual performance of its terms and provisions by the par-
ties for several years, during which time some thirty payments have
been made.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

HIRAM T. GILBERT, for appellant.

GEORGE A. CHRITTON, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

This suit was begun by a bill in equity filed by Philip C., William H., Julius W. and Douglas Dyrenforth, as partners, under the name of Dyrenforth & Dyrenforth, against John F. Palmer, J. S. Driver and the Palmer Pneumatic Tire Company, for an accounting, injunction and other relief. Upon the hearing the bill was dismissed as to Palmer and Driver, but as to the Palmer Pneumatic Tire Company (hereinafter called the Palmer Company) there was a finding and decree for the complainants in accordance with the prayer of the bill. From the decree the Palmer Company appealed to the Appellate Court for the First District. From this judgment of the Appellate Court affirming the decree below the Palmer Company has prosecuted a further appeal to this court.

The main features in the case as presented by the bill and testimony are as follows: Appellees for a number of years prior to 1898 were engaged in the practice of patent law in the city of Chicago, where they reside and maintain their office. The Palmer Company is an Illinois corporation engaged in the sale of pneumatic tires manufactured under patents owned by it. During the time of the transactions out of which this controversy grows, John F. Palmer and E. A. Driver owned practically all the stock in the Palmer Company and managed and controlled its affairs. Appellees for a number of years had been the patent attorneys for the Palmer Company, and in that capacity had given

legal advice, prosecuted applications for patents and represented said company in its patent litigation.   For these services appellees were paid, from time to time, such compensation as their services were worth, but they had no contract, no retainer and no salary.   While neither party was obliged to continue the relation, neither was disposed to dissolve it.   In the winter of 1894 and 1895 Douglas Dyrenforth was in England on business connected with the Palmer Tire Company, an English corporation, and while there he sold the Palmer British and continental patents for $150,000.   For this service the appellees were paid a special compensation of five per cent on the amount of the sale. The business relations of the parties continued without interruption.   In 1898 Douglas Dyrenforth was again in England, and while there he received a cablegram from E. A. Driver saying that he desired to sell the Palmer Company and requesting Mr. Dyrenforth to investigate.   Conditions abroad being regarded as unfavorable, Mr. Dyrenforth returned without attempting to make a sale.   Soon after his return negotiations were had which resulted in Douglas Dyrenforth being employed to make a sale of all the property, including its patents, belonging to the Palmer Company. There is some conflict in the evidence in regard to the amount of compensation of Douglas Dyrenforth in case a sale was effected, but that there was such employment, and valuable services rendered in pursuance thereof, is admitted. Under the agreement the minimum price at which a sale was authorized was $250,000.   The Palmer Company did no manufacturing.   It owned numerous patents and employed other companies to manufacture its goods under them.   The B. F. Goodrich Company, of Akron, Ohio, had for many years manufactured substantially all of the goods sold by the Palmer Company.   The Goodrich Company thus became acquainted with the extent of the business and the value of the patents of the Palmer Company.   After his employment to sell the property Douglas Dyrenforth immediately opened

up negotiations with the Goodrich Company with a view of selling the property of the Palmer Company to it. These negotiations were successful. On September 26, 1898, a contract was entered into, by which the Palmer Company sold, assigned and conveyed all its property to the Goodrich Company for the consideration of $394,750, payable in installments of $35,000 per year, payable in four equal quarterly payments on the first days of October, January, April and July in each year, such payments to begin on the first day of October, 1898, and to end on the first day of October, 1909, and said Goodrich Company to pay $1000 on the first day of January, 1910, at which time all payments by said company under the agreement would cease. After the sale was consummated a controversy arose between appellant and appellees in regard to the compensation appellees should receive for effecting the sale of the appellant's property. Appellees contended that there was an express agreement that their compensation should be ten per cent of the amount for which the property sold, while appellant contended that their compensation was to be five per cent. The difference in regard to appellees' compensation was discussed in letters passed between the parties, in communications by telephone and in conversations had between Mr. Palmer on the one hand and Philip C., William H. and Douglas Dyrenforth on the other. On September 27, 1898, the following letter was mailed to appellant:

"JOHN F. PALMER, ESQ.                    "*Sept. 27, 1898.*
   *Palmer Pneumatic Tire Co., 133-139 Clinton St., City.*
   "*Dear Sir*—When our firm was consulted by you on the matter of selling out your business, an agreement was entered into with you that we should conduct negotiations with a view of selling the business outright or granting a selling license on the basis of a royalty regulated by the number of tires sold. It was expressly agreed that if the sale was effected we should receive ten per cent of the amount received by your company and if a royalty arrangement was consummated we should receive five per cent. In case of sale we should be chargeable with the expenses incurred by us and in case of an arrangement on a royalty you should be charged with

the expenses.   On the strength of this contract we immediately took the matter in hand and fully outlined to you what course to pursue, explaining that the price of $250,000, for which you were willing to sell, was too low and that you ought to get at least $400,-000.   You authorized us to close on a basis of partial payments, provided you should be assured of your money.   As the result of the negotiations conducted by our Mr. Douglas Dyrenforth on the lines he planned and advised and with the party primarily suggested by him the deal was closed yesterday, whereby the sale was made of your business to the B. F. Goodrich Company for the sum of $385,000, or thereabouts, payable in quarterly installments of $8750 each.   This is about $145,000 more than the minimum for which you were willing to sell.

"According to our contract with you we are entitled to ten per cent of each payment, and will be very glad to be advised if a trustee is appointed as provided in the contract of sale, so that he may be instructed to remit to us our share of the quarterly payments. Until his appointment we shall expect to have our ten per cent remitted to us by the Palmer Pneumatic Tire Company.

"Yours very truly,

DOUGLAS DYRENFORTH."

No adjustment of the matter having been reached, on September 30 the following letter was mailed by appellees to appellant:

"*Sept. 30, 1898.*

"JOHN F. PALMER, ESQ., *133 So. Clinton St., City.*

"*Dear Sir*—After a day and a night's consideration I have been unable to overcome the aversion of my partners to enter suit against a client.   They fully agree with me, however, that your course in refusing to pay ten per cent, if adhered to, would evidence a shameless ingratitude.   If you can enjoy your position you are welcome to it.   For myself, I need only say that if you think it to your interest to sacrifice my good will and friendship, both of which have been valuable to you in the past, so that you can increase your income five per cent, why, make the most of it.

"You ought to remember that Astor House talk only settled that the original commission contract was in force and that I was not to be limited to a *per diem*.   You thought that as you had done the work of carrying out my plans I should not be further recognized in the matter.   This I resented, and you came down.   Then I did all the rest of the work myself, as originally contemplated, and am hence entitled to the compensation originally agreed upon.

"I have caused my expenses to New York to be itemized and herewith enclose a memorandum of same, the difference between which amount and $425 drawn by me from Mr. Griffith please deduct from the first payment due us.

"In behalf of the B. F. Goodrich Company this office will send you for execution certain documents, and as soon as our clerks can arrange your papers they will be sent to you for such disposition as may be proper.

"Very respectfully,
                              DOUGLAS DYRENFORTH.

"P. S.—The matter may be too delicate for you to appreciate, but I will say that a controlling reason why my firm objects to litigation with you is, that to succeed we would have to make public confidential matters; and while their preservation is to your interest, we would rather sacrifice the money than alter our usual practice as professional men.                              D. D."

On October 11, 1898, appellant replied to the foregoing letter, as follows:

"CHICAGO, *October 11, 1898.*

"DYRENFORTH & DYRENFORTH, *1552 Monadnock Bldg., Chicago.*

"*Gentlemen*—It is something over a week since the receipt by me of the intemperate and ill-considered letter of your Mr. Douglas Dyrenforth. I have concluded to let it pass without reply. To the firm of Dyrenforth & Dyrenforth, however, I beg to say that further consideration of the matter has forced upon me the conviction that in the natural irritation consequent on receiving a demand for compensation far in excess of what had been agreed upon I did myself an injustice by peremptorily refusing to discuss or entertain the claim, no doubt presented by the firm in good faith, on hearing, however, but one side of the case. I feel, then, that it is due myself that a few facts that were clearly in evidence at the time of the Astor House conference should be placed before you,—facts that are susceptible of proof, did I care to prove them.

"First, your Mr. Douglas Dyrenforth had nothing to do with interesting the B. F. Goodrich Company in the project, or, secondly, bringing the deal to a point where its consummation was barred only by a condition in the Hartford license objectionable to the Goodrich Company, his labors from the time he came to New York being directed almost wholly toward removing the said unsatisfactory condition and answering questions relative to the status, scope and validity of the patents,—work I considered entirely within his line of duty as attorney for the Palmer Pneumatic Tire Company, and as such entitled to his *per diem* compensation and expenses, only. When he brought the subject up by asking if he should charge his expenses to us I expressed surprise at the question, whereupon the whole matter was opened and I gave careful consideration to what he had to say, both business and sentiment; and in the same spirit of friendly consideration that had always characterized my dealings with him, I agreed if he would take the whole burden of concluding the deal on his shoulders as far as was possible, and

would agree to act as attorney for the Palmer Pnuematic Tire Company in any question that might arise relative to the proposed contract and its obligations without charge other than expenses, I would pay five per cent of the yearly payments of the Goodrich Company as full compensation therefor. This being agreed to, I turned the whole matter over to him, whenever possible.

"This letter is in no sense a re-opening of the question of your compensation. We stand ready to pay you the five per cent as soon as remittance is had from the B. F. Goodrich Company and are in receipt of the acquiescence of your firm in the above arrangement. Your bill for expenses we will allow, as it is not worth squabbling over. As to whether our business relations continue outside of the above matter, I would say it rests entirely with your Mr. Douglas Dyrenforth. His common sense and appreciation of favors shown him in the past should make it unnecessary for me to point out what is due me from him, otherwise the receipt of all papers pertaining to our matters or belonging to us will be appreciated.                              "Yours very truly,

                                                  J. F. PALMER."

Other correspondence followed, which resulted in a meeting of Mr. Palmer and Mr. Driver with Philip C., William H. and Douglas Dyrenforth at the law office of appellees in the latter part of October, 1898. At this meeting the whole controversy was gone over and a final agreement made that the appellees should receive ten per cent on the amount of the sale to the Goodrich Company, five per cent of which was to be paid upon each installment as the same was received by appellant from the Goodrich Company and the remaining five per cent to be paid when the Goodrich Company made its final payment. As a part of the final settlement appellees agreed to attend to all patent litigation then existing or that might arise in regard to any of the patents assigned by the appellant to the Goodrich Company. One of the most valuable patents transferred to the Goodrich Company was in litigation at the time of the sale. In view of this litigation a clause was inserted in the sale contract to the Goodrich Company, under which the Goodrich Company might re-convey to the Palmer Company or its assigns all the property conveyed to it under the agreement and be released from all further payments in case if, on final

hearing in the United States Circuit Court of Appeals, patent No. 489,714 (re-issue 11,677) should be declared void or invalid, provided that one of the counsel of said Goodrich Company in any such litigation should be approved by the Palmer Company or John F. Palmer. The compromise agreement above referred to was reduced to writing by appellees about November 18, 1898, and forwarded to Mr. Palmer. Accompanying the agreement was a request for Mr. Palmer to sign or initial it and have Mr. Driver do so. At the bottom of the letter appears the following:

"D. D.—I have turned the agreements over to Mr. Driver. They are all right, except it does not clearly say that we are liable for ten per cent only on actual money received in case of discounting the contract for cash. He will have it fixed and return the same to you. I go south this P. M.      J. F. P."

The agreement was not returned to the appellees. The Goodrich Company met all of its obligations to appellant in accordance with the agreement and appellant paid appellees five per cent regularly until July, 1905. During this period of nearly seven years all of the parties concerned complied with their contract obligations and their relations were apparently pleasant and satisfactory. On February 12, 1903, appellees not having any written memorandum of the compromise agreement of October, 1898, wrote John F. Palmer the following letter:

"CHICAGO, *February 12, 1903.*
"MR. J. F. PALMER, *900, 169 Jackson Boulevard, Chicago.*

"*Dear Sir*—At the time of the meeting in our office to settle the amount of compensation for the Palmer Pneumatic Tire Company to us for Mr. Douglas Dyrenforth's services in effecting the sale of the Palmer patents to the B. F. Goodrich Company, it was agreed between you and Mr. Driver on the one hand, representing the Palmer Pneumatic Tire Company, and Messrs. P. C., W. H. and Douglas Dyrenforth, representing Dyrenforth & Dyrenforth, that we should receive five per cent of each quarterly installment when paid by the B. F. Goodrich Company and an additional five per cent of the entire amount of the purchase price for the patents when paid by the B. F. Goodrich Company. These quarterly payments are liable to extend over a further period of a number of years, and there is always the possibility that the parties to our agreement

may all be dead when the time arrives for the final settlement with us. Obviously, the absence of a written statement of the agreement might give rise to dispute between the representatives of the respective parties. This, of course, you do not desire any more than we do. We therefore request that you and Mr. Driver will join in a brief statement in writing to us of the agreement, or, if you prefer, we will prepare and submit to you the contract in writing to be signed by all the parties. Kindly advise us.

"Very truly yours,

DYRENFORTH & DYRENFORTH."

A few days after this had been mailed, this letter was returned to appellees by Mr. Palmer, he having changed the words "purchase price," in line 10 of the said letter, to the words "money paid," and having enclosed in brackets the following words: "It was agreed between you and Mr. Driver on the one hand, representing the Palmer Pneumatic Tire Company, and Messrs. P. C., W. H. and Douglas Dyrenforth, representing Dyrenforth & Dyrenforth, that we should receive five per cent of each quarterly installment when paid by the B. F. Goodrich Company and an additional five per cent of the entire amount of the money paid for the patents when paid by the B. F. Goodrich Company." At the bottom of the said letter Mr. Palmer had written with his pen the following: "Excepting your obligation to take care of all litigation, above enclosed paragraph is correct. Prepare a formal agreement, if you think it necessary, and when Mr. Driver returns from California we will sign.—J. F. Palmer."

In 1904, E. A. Driver died, and his son, John S. Driver, succeeded to his interest in the Palmer Company. After the death of E. A. Driver, the Palmer Company, through John F. Palmer and John S. Driver, president and secretary-treasurer, respectively, and the principal stockholders of the Palmer Company, repudiated the contract with appellees and refused to make any further payments thereon, and this litigation followed. The cause was heard by a master in chancery upon the bill of appellees and answer thereto; a cross-

240—3

bill of appellant praying for a decree declaring the contract illegal and void and for a re-payment of all sums previously paid thereunder; an answer to such cross-bill, and the proofs submitted by the parties. The master in chancery found for the appellees, and recommended a decree awarding appellees five per cent of all payments as such payments were from time to time made by the Goodrich Company and an additional five per cent when the payments of the Goodrich Company were completed, and recommending the dismissal of the cross-bill. The case was heard in the circuit court on exceptions to this report, all of which were overruled and a final decree entered in accordance with the master's report.

The appellant devotes a large portion of its brief in this court to a discussion of questions, both of law and fact, in regard to the original agreement that was made, by which Douglas Dyrenforth was employed to sell the property of the Palmer Company. In the view we have of this case such discussion is irrelevant. That there was some sort of an agreement is clearly established, and it is just as clear that there was a dispute between the parties, after the services had been performed, as to the terms of such contract. Whatever the terms or legal effect of the original employment were, such prior contract was abrogated by the compromise agreement of October, 1898. If there was a dispute between the parties respecting the original understanding, and the parties, for the purpose of settling such dispute, voluntarily entered into a compromise agreement, it is not pertinent, in a suit upon such compromise agreement, to go back of it and inquire into the merits of the respective contentions in regard to the original understanding. The making of the compromise agreement cannot, under the evidence in this record, be seriously controverted. In fact, appellant does not deny the making of such contract but seeks to avoid its binding force, and urges a number of reasons in support of its contention in this regard.

Appellant insists that in view of the relation existing between the parties the contract is so unconscionable that a court of equity will refuse to enforce the same. In support of this contention it is pointed out that by the decree appealed from appellees will receive a total of nearly $40,000 for services rendered which altogether occupied less than one month's time. While this compensation, viewed from the point of time expended, seems large, yet when the value of these services to appellant is considered the unreasonableness of the compensation disappears. Appellant owned property which it was willing to sell for $250,000 and pay a compensation out of that for making the sale. Appellees sold this property for $143,000 more than the appellant was willing to take for it. After paying appellees the compensation awarded, appellant will still have more than $100,000 over and above the minimum price at which it was willing to sell the property. In this connection it must be borne in mind that by the compromise agreement appellees obligated themselves to attend to all of appellant's patent litigations during the continuance of the Goodrich contract, and in case appellant should become involved in litigation requiring the services of lawyers in the general practice, appellees agreed to employ and pay the fees of such attorneys. There is no complaint that appellees have not faithfully kept this part of their agreement. The evidence shows that appellees have rendered valuable legal services to the appellant under this clause of their agreement. There is no proof in the record as to what would be the usual commission or compensation for making a sale of this kind. The evidence is that Douglas Dyrenforth told Driver that he had made some inquiry as to what commissions were usually charged for that kind of work, and that he found that agents charged all the way from one-half to almost nothing, and that twenty to thirty-three and one-third per cent were very common charges.

Much is said by appellant about the relation of attorney and client and the rules which courts of equity apply to con-

tracts entered into by an attorney with his client. While courts of equity will scrutinize very closely all dealings of an attorney with his client, and will, when such contract is called in question, cast upon the attorney the burden of showing, by evidence that is clear and satisfactory, that the contract was fairly and intelligently entered into by the client, still such courts have never gone to the extent of holding that the relation constitutes an absolute incapacity of the attorney to contract with his client. The rules of law applicable to contracts of this character were clearly laid down by this court in *Morrison* v. *Smith,* 130 Ill. 304. In that case the rule recognized in some jurisdictions that such contracts are voidable at the election of the client was rejected as being contrary to the weight of authority and the rule announced that the relation created no necessary incapacity, and while the transactions between attorney and client will be closely scrutinized, yet those which are obviously fair and just will be upheld. When all of the circumstances connected with this transaction are considered we do not regard the contract as unfair or otherwise unconscionable.

It is further contended by appellant that the compromise agreement is not valid for the reason that it was entered into through duress or undue influence exercised by appellees by means of the letter of September 30, 1898, which is set out above. After reading the said letter several times, together with the argument of appellant based thereon, we are wholly unable to see how any intelligent person could construe this letter into a threat to institute litigation in the course of which it would become necessary to reveal confidential matters. On the contrary, the letter contains a distinct statement that no litigation would be resorted to because the writer had been unable to overcome the aversion of his partners to entering suit against a client. A reading of the letter referred to is a sufficient answer to appellant's contention on this point.

It is insisted by appellant that the compromise agreement is invalid under the Statute of Frauds, which is relied upon in the answer. It will be remembered that the draft of the agreement sent to Palmer appears not to have been signed. In a letter acknowledging a receipt of the agreement Palmer wrote appellees as follows: "I have turned the agreements over to Mr. Driver. They are all right, except it does not clearly say that we are liable for ten per cent only on actual money received in case of discounting of the contract for cash. He will have it fixed and return the same to you. I go south this P. M." Under the authorities this letter of acceptance must be held as a sufficient signing to meet the requirements of the statute. (*McConnell* v. *Brillhart,* 17 Ill. 354; *Cossitt* v. *Hobbs,* 56 id. 231; *Western Union Telegraph Co.* v. *Chicago and Paducah Railroad Co.* 86 id. 246.) Another answer to this contention of appellant is, that the contract is taken out of the statute by the mutual execution of its terms and provisions, on the principle of part performance. *Western Union Telegraph Co.* v. *Chicago and Paducah Railroad Co. supra.*

Appellant further insists that the decree should be reversed because it is claimed that the contract with the Goodrich Company was not a sale, but merely a license authorizing the Goodrich Company to manufacture under the patent assigned by the Palmer Company. There is no substantial ground for this contention. The contract entered into between the Palmer Company and the Goodrich Company recites on its face the transfer to the Goodrich Company of "the whole right, title and interest in and to certain letters patent of the United States," describing said patents by their numbers, and by the third clause of the said agreement it is provided that as a part consideration for the payments to be made to it, the said Palmer Company "has sold, assigned, transferred and set over, and by these presents does sell, assign, transfer and set over, unto the said Goodrich Company, its successors and assigns," which language is

followed by an enumeration of various items of property, which, from the evidence, we understand included all of the property, of every kind and character, which the Palmer Company owned or used in connection with its business. To cover the contingency of the unfavorable termination of certain litigation then pending, in which the Hartford Rubber Company was contesting the validity of one of the patents assigned, a clause was inserted in the agreement releasing the Goodrich Company from all further payments in case the United States Circuit Court of Appeals should finally declare said patents to be invalid. This clause is in the nature of a condition subsequent, and had no effect on the character of the transaction or on the title of the Goodrich Company until such condition happened. The condition referred to has not happened, and there is no reasonable probability that it will happen within the time covered by the Goodrich contract. Appellant's obligation to appellees is only to pay a per cent upon the money received from the Goodrich Company. The decree below requires nothing more of appellant. The transaction with the Goodrich Company was a sale, and there is therefore no basis for the contention that the appellees misrepresented the nature of the transaction to appellant.'

There are some other reasons urged by appellant in its brief for a reversal of this decree, but we do not regard them as of sufficient importance to require discussion.

In view of the acquiescence of appellant for a period of seven years in this contract, during which time some thirty different payments were made to appellees under it, we think the decree of the circuit court below requiring appellant to complete the execution of this contract in good faith is equitable and just.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*