Saul Miller et al., Plaintiffs-Appellants, v. Samuel Solomon, Defendant-Appellee.
Samuel Solomon, Counterclaimant-Appellee, v. Saul Miller et al., Counterclaim-Defendants, Appellants.

Gen. No. 49,264.

First District, Fourth Division.

May 20, 1964.

Rehearing denied June 17, 1964.

George J. Anos and Joseph Ash, of Chicago, for appellants.

Bowe, Bowe & Casey, of Chicago (John D. Casey, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from a judgment entered in the Circuit Court of Cook County dismissing the complaint of Saul Miller and Frances Miller for want of equity, and finding in favor of Samuel Solomon, counterplaintiff, as to certain items in his countercomplaint. A judgment was entered in favor of the counterplaintiff for $3,897.40.

The plaintiffs were injured in an automobile accident on May 30, 1958, and employed the defendant to prosecute their claim for bodily injuries and property damages. The defendant filed a complaint against one Isaac Sigal. Prior to filing the complaint, the following agreement was entered into between the plaintiffs and the defendant:

> "I hereby retain and employ Samuel Solomon, Attorney, to prosecute and settle all suits and claims for damages against I. Sigal on account of personal injuries and damages by me sustained on the 30 day of May, A.D. 1958.
>
> "And I agree to pay him as compensation for his services a sum of money equal to ⅓ of any amount realized from said claim either by settle-

157

ment or otherwise, and it is further agreed that no charge for service will be made unless recovery is had in the above claim."

Both Saul and Frances Miller signed this agreement, and paid the defendant $50 for costs.

Pleadings were filed and answered, discovery was sought, and depositions taken in the suit against Sigal. On April 30, 1962 the defendant wrote a letter to Frances Miller in which he informed her that in accordance with their telephone conversation the same day, a settlement had been negotiated for $11,000. Enclosed with the letter were releases which the defendant directed the plaintiffs to sign. The letter contained the following paragraph:

"As per our previous discussions, of the total settlement, $1,000.00 will be deducted for expenses, leaving the balance on hand of $10,000.00, of which I will deduct one-third or $3,335.00 for attorney's fees, $325.00 for your collision carrier and $200.00 for the balance due on the costs, making total deductions of $4860.00 from the settlement of $11,000.00, which will leave the net to you of $6140.00."

Frances Miller testified that after receiving the letter she went to the defendant's office, at which time he told her he would have to pay $1,000 to "his man on the outside," and that she would be required to pay $325 for the collision carrier, $200 for the court costs, and one-third to him. After this conversation [which is not denied by the defendant] the defendant wrote Mrs. Miller a letter, dated May 16, 1962, in which he stated that the defendant, Sigal, had withdrawn the settlement offer. The letter contained the following paragraph:

"It appears that the insurance company had allocated the sums for the offer towards your claim

158

and since it has not been accepted, I assume that they will use these funds to settle another claim or claims."

It was further stated in the letter that since the plaintiffs had refused to accept the settlement there was nothing further that he could do at that time, and he requested the return of the releases.

On May 18, 1962, a letter was sent to Solomon, signed by the Millers, discharging him as their attorney in the case against Sigal and requesting him to turn over all the papers in the case to Green and Green, another firm of attorneys. In a letter dated May 23, 1962, to Frances Miller, the defendant stated that he had in his letter of May 16 requested the return of the releases, and that since they failed to return them they may have closed the door in the future to further attempts at settlement, and that if no money at all was collected, it would not be the fault of the defendant.

Subsequently, through other attorneys, the plaintiffs negotiated an $11,000 settlement with Sigal. The defendant had filed an attorney's lien which he refused to release. The plaintiffs then filed the instant proceeding in equity. In their complaint they set out generally the facts as we have stated them, and in their prayer they ask that Solomon be required to release his attorney's lien, or that the court hold such lien as invalid. The defendant, Solomon, filed a motion to dismiss plaintiffs' complaint, which was overruled, and he thereupon filed an answer and counterclaim.

In the answer Solomon alleges that the letter sent by him to Mrs. Miller was not a statement of an account between the parties, but merely a summary of agreements and discussions held between them. He alleges that the Millers had agreed to pay $1,000 out of the settlement proceeds to an attorney Wolf, who officed with Solomon, as a fee for his legal ser-

159

vices, which payment was referred to in the letter as "expenses"; that they had agreed to pay the costs and expenses incurred in the suit against Sigal which were enumerated; and defendant denies that the plaintiffs are entitled to the relief prayed for. He prays that the complaint be dismissed for want of equity.

In his counterclaim, Solomon sets out the agreement between himself and the Millers, and alleges that he diligently prosecuted the claims and filed suit in the Superior Court; that he had received an offer of $11,000 in settlement of the claims, which the Millers had agreed to accept; and that he thereupon made such a settlement with the attorneys representing Sigal. He further alleges that the defendants are liable to him for his attorney's fees and for expenses incurred in the prosecution of such claims. He further alleges that he is entitled to receive from the Millers as fees either $4,333.33, including the $1,000 which is to be paid to Wolf, in accordance with their alleged agreement made on or about April 30, 1962; or, if they refuse to abide by that agreement, $3,666.66, representing one-third of $11,000, pursuant to their contract. He further alleges that the counterclaimant is entitled to receive $146.10, representing the balance due him for court costs and other expenses of prosecuting the claims after giving the Millers credit for $50 paid by them to apply on such expenses. The counterclaimant then prays for judgment in the sum of $4,500.

The Millers filed a reply to the defendant's answer in which they specifically deny that they had agreed to pay $1,000 to attorney Wolf out of the settlement. They deny that they prevented the defendant from completing the settlement in the amount of $11,000, but allege that the settlement was thwarted by defendant's attempt to procure out of the settlement proceeds monies which were greater than he was entitled

160

to. They deny that the counterplaintiff was willing to discuss his fee and expenses with the plaintiffs.

The Millers also filed an answer to Solomon's counterclaim in which they admit that suit was filed on their behalf against Sigal by Solomon. They admit that Solomon had obtained an offer of $11,000 in settlement of their claims, but that Solomon on May 16, 1962, advised them that the offer had been withdrawn by Sigal. They admit that there was a settlement for $11,000 made with the representatives of Sigal, but allege that it was made through the sole efforts of their now attorney; and they pray that the counterclaim of Solomon be dismissed and judgment entered in favor of the Millers.

The case was tried without a jury before a judge of the Circuit Court of Cook County. Solomon testified in his own behalf and under section 60 of the Practice Act. Green, an attorney, testified at the request of the Millers, and Mr. and Mrs. Miller both testified.

In Solomon's testimony he stated that Mr. Wolf was one of his office associates; that Mrs. Miller called him by 'phone and came in to see him almost every Monday that she was in Chicago. He said he told her that Mr. Wolf would handle this matter and they would take 10 per cent out of the settlement which they might get, to give to Mr. Wolf for his services, and that Mrs. Miller did not disagree with that arrangement. He further testified that the letter of April 30 in which he listed the $1,000 as "expenses," had been dictated by him hastily, and did not come "from my secretary's desk exactly the way I dictated it." He stated that Mrs. Miller had raised no question about the payment of the $1,000 fee. He also testified that the figures in that letter with reference to the court expenses were not correct. These were only approximate figures, and the letter was written merely for the purpose of having the Millers sign the releases

161

and send them back to Solomon, whereupon he would review his files and determine what sums should be paid and to whom.

Solomon further testified that the withdrawal of the offer from Sigal for $11,000 was a qualified withdrawal, and he thinks the offer would have been revived if he had sent the executed releases to Sigal's insurance carrier.

Mrs. Miller testified that after she had received the letter indicating that $1,000 would be paid for expenses, she went to Solomon's office; that he told her she would have to pay the $1,000 to his man on the outside; that Wolf was not mentioned at that time, and that at no time did she ever have any conversation or agreement with Solomon to pay Wolf an additional 10 per cent of the settlement as a part of the costs.

The trial court permitted the plaintiffs to file an amendment to their complaint, in which they alleged, among other things, that the defendant did not settle the claim nor recover any money for the plaintiffs in their claim against Sigal, and that the recovery of money in that claim was made by another firm of attorneys after Solomon had been discharged. In that complaint the Millers prayed that Solomon be barred from asserting or claiming any attorney's fees from the plaintiffs under his written contingency fee contract; that he be restrained and enjoined by order of the court from prosecuting an action at law for the collection of any attorney's fees relating to the claim of plaintiffs against Sigal; and that he be ordered to release his attorney's lien filed with Sigal, or that the court decree that such lien is void and unenforceable.

On April 18, 1963, the court entered a decree and judgment which provided that on the Millers' complaint the court found the issues in favor of the de-

162

fendant, Solomon, and ordered that the Millers' complaint be dismissed for want of equity. On Solomon's counterclaim the court found the issues in favor of Solomon and against the counterclaim-defendants, the Millers, and found that Solomon was entitled to recover the unpaid balance of court costs amounting to $146.10, attorney's fee in the sum of $3,526.30 for services rendered in connection with the claims against Sigal, and a sum which Solomon is to pay to Commercial Union Group in settlement of its subrogation claim under its collision insurance policy with the Millers in the amount of $225. The court assessed counterclaimant, Solomon's, damages in the sum of $3,897.40, and judgment was entered accordingly.

From that decree and judgment the Millers filed this appeal.

█ There is no question that a fiduciary relationship exists as a matter of law between attorney and client which requires all transactions between them, growing out of such relationship, to be subject to the closest scrutiny. Gaffney v. Harmon, 405 Ill 273, 90 NE2d 785. In that case the court cites with approval Oil, Inc. v. Martin, 381 Ill 11, 44 NE2d 596, in which opinion the court cites Jennings v. McConnel, 17 Ill 148, as follows:

"... In the relation of client and attorney or solicitor, there is that confidence reposed in the latter which gives rise to very strong influences over the actions, rights and interests of the former. Hence the law, with a wise providence, not only watches over all the transactions of parties in this relation, but often interposes to declare transactions void, which, between other persons, would be good. And this is applicable to contracts or gifts generally, while the confidential relation continues, and is not confined to particular prop-

163

erty about which the attorney may have been employed. It is not required that a client should establish fraud or imposition—the onus of proof—upon showing the relation when the contract or gift was made, is upon the attorney to show fairness, adequacy and equity; and upon failure to make proof, courts of equity treat the case as one of constructive fraud. The highest degree of good faith and fairness is expected, and exacted. . . ."

A similar rule is laid down in Elmore v. Johnson, 143 Ill 513, 32 NE 413, and in Hamilton v. Grady, 314 Ill App 568, 41 NE2d 968 (Abst), the court states that where a client attacks a contract with his attorney for any unfairness between the client and his attorney, the client is not required to establish fraud or imposition, but the burden of proof is upon the attorney to show that the contract was entered into fairly, and to show

". . . that the client was fully advised on all the facts, their adequacy and equity; and that upon the attorney's failure to make such proof, equity treats the case as one of constructive fraud. [Citing cases.] . . ."

In Bounougias v. Peters, 49 Ill App2d 138, 198 NE2d 142,* this court recently had occasion to consider this question. In discussing a contract between attorney and client the court says:

". . . While in some jurisdictions such a contract has been declared voidable at the election of the client, we believe the better rule to be that pronounced by our courts to the effect that the con-

---

* In that case Pocius v. Halvorsen, 30 Ill2d 73, 195 NE2d 137, is cited with approval.

164

tract is only presumptively fraudulent. Jordan v. The Ray Schools-Chicago, Inc., 49 Ill App2d 1; Awotin v. Abrams, 321 Ill App 304. In such a situation the attorney is in no way incapacitated from contracting with his client, but he must bear the burden of showing the utmost good faith, with complete disclosure on the part of the attorney, complete understanding of all facts and the legal consequences thereof on the part of the client, and demonstrable fairness of the agreement reached."

The court cites Rose v. Frailey, 10 Ill2d 514, 140 NE 2d 711; Ross v. Wells, 6 Ill App2d 304, 127 NE2d 519; Mansfield v. Wallace, 217 Ill 610, 75 NE 682; Dyrenforth v. Palmer Tire Co., 240 Ill 25, 88 NE 290; and ILP Attorneys and Counselors, § 65.

Pocius v. Halvorsen, 30 Ill2d 73, 195 NE2d 137, is the latest case decided by the Supreme Court on this subject. In that case the court defines a contingent contract as one that provides that a fee is to be paid to the attorney for his services only in case he wins, and that the fee is made to depend upon the attorney's success or failure to enforce a supposed right and is generally paid out of the recovery for the client. (Adair v. First National Bank, 139 SC 1, 137 SE 192.) The court also says, at 30 Ill2d 83, 195 NE2d 142:

"Furthermore, it does not necessarily follow that, under all circumstances, a contract entered into prior to, and as a condition precedent to, the creation of an attorney-client relationship can, unless influenced by actual fraud or by mistake, be enforced as written. Contingent fee contracts do have the practical effect of giving an attorney a pecuniary interest in the successful prosecution of the litigation and, therefore, it is felt that unless absolutely fair they will adversely affect

165

the usual attorney-client relationship. (Note, Lawyer's Tightrope—Use and Abuses of Fees, 41 Cornell LQ 683.) For this reason, and because such contracts sometimes lead to solicitation and otherwise bring disrepute to the law, they are closely scrutinized by the courts. (Gair v. Peck, 6 NY2d 97; 160 NE2d 43, cert denied and app dismissed, 361 US 374.) And this is true without regard to whether or not they are entered into during the attorney-client relationship. (Soper v. Bilder, 87 NJ Eq 564, 100 A 858.) 'A contingent fee contract is always subject to the supervision of the courts as to its reasonableness.' Tonn v. Reuter, 6 Wis 2d 498, 95 NW2d 261."

In the instant case the attorney's claim for the additional 10 per cent, or $1,000, is based upon an agreement which he states was entered into by him with the Millers after the contingent fee contract had been signed and was in effect. His contention is that the agreement was based upon a legal fee which he, Solomon, had agreed to pay an associate of his for working on the case. In 7 CJS Attorney and Client, § 185 (1937 Ed), it is said:

"Where an attorney employed to take a case turns it over to his associate or successor, the latter is bound by the contract of his predecessor, and he may not claim fees in excess of those for which the first attorney agreed to conduct the case; it is otherwise, however, where the second attorney is employed by the client and is not aware of any prior contract."

Section 182 states:

"The right to extra compensation may be controlled by the agreement. No extra compensation is ordinarily recoverable for services incidental

166

to the proper conduct of the specific legal matters entrusted to the attorney. While an attorney may be entitled to extra compensation for services not contemplated as probable or necessary at the time of making the agreement, in doubtful cases such services are usually held within the contract."

In the instant case the services which Solomon alleges were to be performed by Wolf were certainly within the terms of the original contract. Furthermore, in order to have a contract for the payment of an additional 10 per cent, a consideration would be necessary. Here none appears. These are matters which an attorney either knew or should have known, and any attempt to acquire additional compensation would violate the fiduciary relationship existing between the client and the attorney.

■ ■ Under the law, an attorney may be discharged by his client with or without cause. The existence or nonexistence of a valid cause for the discharge of the attorney would bear only on his right to compensation (Regan v. Chicago, M. & St. P. R. Co., 204 Ill App 115), and as to whether or not valid cause for the discharge of the attorney exists must be determined under the circumstances of each case. The client, if he rightfully or wrongfully distrusts his attorney or disbelieves in his capacity, may terminate the attorney-client relationship, since such lack of confidence could seriously interfere with the normal relationship of attorney and client.

In this case, it appears that the trial court took the view, and properly, that the attorney could not enforce the 10 per cent-$1,000 alleged agreement. The attorney had also engaged in an employment with the insurance carrier of his clients, the Millers, to recover for the insurance carrier certain monies from Sigal. In accordance with that agreement, he made a settle-

167

ment that Sigal should pay $225 to the Commercial Union Group, the insurance carrier for the Millers. This agreement was not revealed to the Millers, nor did they consent thereto. In the letter written by the attorney he also attempted to impose upon the settlement an additional $100 fee for the services which he rendered to the insurance carrier. The trial court also properly disallowed such fee. The attorney, if he was representing the carrier—and there is some question as to whether such representation was adverse to the interest of the client—should have properly made a separate and distinct settlement with Sigal for the $225 instead of lumping it in with the settlement made on behalf of the Millers in their claim against Sigal.

█ The Millers discharged Solomon after they had received certain letters from him. Reading the entire record, it would seem that they had reasonable grounds for distrust in their attorney and justifiable ground for terminating their relationship with him. Under such circumstances and considering all the facts appearing in the record, the attorney would have no right to recover under his original contingent fee contract. That contract fell with his discharge for cause.

█ █ Solomon had apparently done the essential work necessary to obtain an offering of settlement from Sigal. However, after Sigal had made a proposition to settle the claim for $11,000 Solomon added conditions to the settlement which were sufficient to justify his discharge by the Millers. Consequently, he cannot recover on the contingent fee contract. As to the question of whether or not he would be entitled to recover in a quantum meruit for the services he rendered, the court decisions are not in accord. See 7 CJS Attorney and Client § 169, sub-par (3).

We know of no Illinois case that passes specifically on this point. In Moore v. Fellner, 325 P2d 857 (Cal

168

1958), the court held that when an attorney breached his contingent fee contract by wrongfully demanding payment of an additional fee for handling appeal, after he had won the case in the lower court and the defendant appealed, his discharge by his clients was for cause. The court, however, further held that under the circumstances of that case the attorney would be entitled to payment for the reasonable value of his services rendered up to the time of his discharge. Also see Henry v. Vance, 111 Ky 72, 63 SW 273. In Stone v. Baldwin, 331 Ill App 421, 73 NE2d 635, the court, by way of dictum says:

> "In determining the propriety of the findings of the court in the hearing on this petition, it is apparent that a client may dismiss an attorney at any time, with or without cause, for the client is entitled to be represented by an attorney in whose ability and fidelity he has confidence. (Conlan v. Sullivan, supra; Doggett v. Deauville Corp., 148 F2d 881; Almon v. American Carloading Corp., 380 Ill 524.) *Where, however, the attorney has been guilty of no misconduct, the courts may require the payment of fair compensation for his services.* (124 ALR 725, note; 5 Am Jur p 284.)" [Emphasis added.]

The cases seem to hold that whether or not an attorney who has been justifiably discharged can recover in quantum meruit for the value of his services depends on the degree of wrongfulness of his conduct.

In Solomon's counterclaim he asked only for recovery on his contingent fee contract. As we have stated, he would have no right to recover under that contract, and the court should have so found.

In the case before us Solomon has not asked for a recovery in quantum meruit and hence, we will not pass upon that question.

In the Millers' amended complaint they ask that Solomon be barred from asserting or claiming any attorney's fees from the plaintiffs under his written contingent fee contract, and that his attorney's lien based thereon be declared invalid. The court should have so found.

The judgment of the Circuit Court of Cook County is reversed and the cause is remanded with instructions that the court will enter a judgment in favor of Solomon for the unpaid balance of costs amounting to $146.10, without prejudice to any claim for services which he might care to assert on a quantum meruit basis; and that the court will order the payment to the Commerical Union Group, the insurance carriers for the Millers, in settlement of its subrogation claim under its collection insurance policy with the Millers, in the amount of $225 upon the presentation of proper and appropriate releases.

The court will also enter a judgment finding that Solomon cannot recover on his original contingent fee contract. The court shall take such other and further proceedings in the cause as are not inconsistent with this opinion.

Reversed and remanded with directions.

ENGLISH, P. J. and DRUCKER, J., concur.