70 Ill. App.2d 89 (1966)
217 N.E.2d 519
Anna L. Phelps, as Special Administratrix of the Estate of Paul A. Phelps, Deceased, Plaintiff-Appellee,
v.
Elgin, Joliet and Eastern Railway Company, a Corporation, et al., Defendants. William O. Arnold, et al., Respondents-Appellants.
Gen. No. 49,993.
Illinois Appellate Court  First District, First Division.
April 25, 1966.
Rehearing denied May 9, 1966.
*90 L. Louis Karton, of Chicago, for appellants.
William H. DeParcq, of Minneapolis, Minnesota, and Robert J. Martineau, of Chicago (Charles Alan Wright, of Austin, Texas, of counsel), for appellee.
MR. JUSTICE BURMAN delivered the opinion of the court.
This appeal concerns a petition filed under the Illinois Attorney's Lien Act (Ill Rev Stats, c 13, § 14, 1963) by Anna L. Phelps to adjudicate the claim of respondents for a lien upon one-third of the proceeds of a settlement and judgment in her favor in the amount of $100,000. The respondents' claim arises from a contingent fee contract for their services signed by petitioner. The case is here on appeal for the second time; on the prior appeal (see 37 Ill. App.2d 46, 184 NE2d 799), we reversed a judgment rendered against respondents on the pleadings, and remanded the cause with directions to take evidence concerning the services rendered by each set of attorneys and allocate the fee accordingly. Our Supreme Court originally granted respondents' petition for leave to appeal this court's order, but later dismissed the petition for leave to appeal. 28 Ill.2d 275, 191 NE2d 241. Pursuant to the remandment, the trial court sitting without a jury took evidence in the case, and entered judgment against the respondents. This appeal followed.
The antecedent cause of action arose from the death of petitioner's husband, Paul A. Phelps, on Saturday December 13, 1958, in the railroad yards in Gary, Indiana, *91 where he was employed. Mrs. Anna L. Phelps, his widow, had been in bed under a doctor's care for two weeks prior to the accident, suffering from double pneumonia. Upon learning of her husband's death, she became hysterical, and then fainted and was put to bed. She was under prescribed medication on Saturday, and all day Sunday.
Clayton Potter had long been a close friend of Mr. and Mrs. Phelps. At Potter's wedding, Paul Phelps had been the best man and Mrs. Phelps had been a bridesmaid; and the couples had gone on vacations together. Potter, who is a truck driver, also worked part time for the law firm of Arnold, Peterson, Bogucki, and Bickley, signing up personal injury case clients on printed contract forms supplied him by Arnold from time to time, and also doing investigatory work for the firm. He testified that on Saturday, upon learning of Phelps' death, he went from his own home in Chicago to the Phelps' home in Gary, and there saw Mrs. Phelps, her brother-in-law Don Engel, and others. He further testified that Mrs. Phelps told him he was Paul's best friend, that Phelps had told her many times that if anything ever happened she should get hold of him (Potter) and of Arnold's office and they would take care of it. Both Potter and Arnold testified that Potter called Arnold at his home to apprise him of the death of Phelps and of Mrs. Phelps' desire to have Arnold's office handle the case. Mrs. Phelps, however, testified that she did not see Potter either on Saturday or on Sunday, and that the first time she saw him after the accident was on Monday, December 15th.
On Sunday, Potter went to Arnold's home and obtained a blank printed form for a contingent fee contract. Mrs. Phelps and Engel testified that on Monday, they met with Potter in the Phelps' home and elicited his assurance that in view of Mrs. Phelps' condition she would not be asked to sign anything. Shortly thereafter, however, Mrs. *92 Phelps signed the contingent fee contract which Potter had received from Arnold. She testified that Potter had presented it to her for her signature when she was preparing to leave for the mortuary on Tuesday, December 16th; that the paper, when she signed it, was blank except for some very fine print which she could not and did not read; and that Potter told her it merely empowered Arnold's office to represent her at the inquest a few days later. Potter, however, testified that Mrs. Phelps asked him if she could sign the contract, and that he thereupon filled out the blanks and read the contract to Mrs. Phelps before she signed it; and that this took place on Monday, December 15th. Engel testified that on Monday Mrs. Phelps was still highly nervous and upset, and was in no condition to transact business. Potter, however, testified that while Mrs. Phelps was upset at the time, she was fairly calm and not hysterical in any way.
Arnold and a court reporter employed by his firm went to the funeral home on Monday evening, where they met Mrs. Phelps, Potter, and Engel. Arnold and the reporter testified that they took a statement from Engel at the funeral home, but Engel denied any conversation with Arnold other than the acknowledgment of an introduction. Engel testified that he asked Potter that evening about the document signed by Mrs. Phelps and was informed that it related to representation only at the inquest, and that "... any time Ann wants it back, this piece of paper back, she can have it," but Engel testified that when he asked Potter to return the document to Mrs. Phelps, or to show it to him, Potter refused.
On Tuesday, several persons were dispatched from Arnold's office to Gary to investigate the case. Mrs. Phelps gave them several small booklets containing primarily the work rules of the railroad. But when they contacted Engel, he was entirely uncooperative, as were the persons they interviewed who were employed in the railroad yards where the accident had occurred.
*93 On Thursday, Arnold prepared and served upon the railroad a notice of an attorney's lien upon Mrs. Phelps' claim against the railroad. Mrs. Phelps and Engel were visiting the railroad offices that day in relation to insurance policies, and while there she was asked whether she was in fact represented by Arnold's firm. She told the railroad official that she had not hired Arnold. Later, with the assistance of Engel, she drafted a letter to Arnold in which she informed him that she retracted the signed agreement, requested the return of all papers in Arnold's possession because she then had no intention of hiring an attorney, and stating that if she could not settle the case she would contact him. The letter was sent by registered mail, return receipt requested, but was not accepted at Arnold's office when delivery was attempted on December 20th. Attempts at delivery also failed on December 29th, on January 14th, and again on January 19th. Arnold testified that when registered letters arrive at his office addressed to an individual, that person must sign for the letter himself, or it is refused. He explained that he thought he was out of town or out of the office when the letters arrived. He also said that anyone in the office can sign for a registered letter addressed to the firm. He testified, however, that he did receive in January a letter from a friend of Mrs. Phelps, who stated that she was writing on behalf of Mrs. Phelps who did not want Arnold to represent her.
A partner in Arnold's firm, Richard F. Peterson, testified that his office continued to investigate the case for months; but admitted that the file indicated the last work performed by them on the case was on December 20th, 1958, seven days after the accident. They did not attend the inquest, or have Mrs. Phelps appointed administratrix of her husband's estate, or file suit, or enter into any negotiation for settlement of the case. Arnold explained that this was, "... because Mrs. Phelps never *94 made up her mind whether she was going to have us handle the case, have someone else handle the case, or settle the case herself."
On January 27, 1959, Mrs. Phelps contacted a representative of the law firm of William H. DeParcq, and thereafter employed his office by signing a contingent fee contract for one-third of the proceeds. DeParcq served the railroad with his notice of an attorney's lien, and then had Mrs. Phelps appointed administratrix. On March 7, 1959, DeParcq filed a complaint on her behalf. He took depositions, made an extensive investigation, and served a large number of interrogatories on the railroad. When the case was reached for trial there were preliminary trial conferences and he filed a brief on the question of whether the case was under the Safety Appliance Act or solely under the negligence provisions of the Federal Employers Liability Act. After lengthy negotiation the case was settled for $100,000 and subsequently a judgment was entered against the railroad for that sum and the proceeds deposited with the Clerk of the Court. By agreement of the parties the sum of $33,333.33 was retained by the Clerk of the Court.
In entering judgment against the respondents, the trial judge made a number of specific findings, which as set forth in its order were basically as follows:
1. The contingent fee contract was void because it was obtained by fraud in the inducement and in the execution.
2. The contract was also void because it was obtained by solicitation by Potter, respondents' agent.
3. The notice of attorney's lien served by respondents upon the railroad was void because it falsely stated that petitioner was the special administratrix of the Estate of Paul Phelps, when in fact she had not been so appointed.

*95 4. Even if the respondents had a contract of employment they were properly discharged for good cause by petitioner.
5. "That even if respondents had a contract of employment, they abandoned it on or about December 20, 1958, by reason of their failure to do any work, file suit, or anything else toward furthering their alleged employment."
6. "That the settlement of this case from which the impounded sum resulted was brought about solely by the work, efforts and talents of William H. DeParcq; that respondents rendered no services which were of any value whatsoever and did nothing to the successful result obtained."
Respondents challenge as contrary to the manifest weight of the evidence the trial judge's findings as to fraud, solicitation, abandonment, and discharge for cause. It is their position that, "the employment agreement was fairly entered into and they were at all times ready, willing and able to perform their agreement to represent Plaintiff, until they were prevented from doing so by Plaintiff's own misconduct."
[1, 2] After a careful examination of the record, we conclude that the finding of the trial judge that, "even if the respondents had a contract of employment they were properly discharged for good cause by the petitioner," is not contrary to the manifest weight of the evidence. In the recent case of Miller v. Solomon, 49 Ill. App.2d 156, 199 NE2d 660, this court held, "... whether or not valid cause for the discharge of the attorney exists must be determined under the circumstances of each case," (49 Ill App2d at 167). The record here supports the finding made by the trial judge that, "... the plaintiff, at, and before affixing her signature to the contract, was receiving medication, was distraught, and emotionally *96 disturbed, as might be expected of a woman recovering from pneumonia and learning that her husband, father of her children, five minors, was killed." Her signature on the contract was apparently procured as she was preparing to leave for her husband's funeral; and her testimony was to the effect that she thought she was thereby appointing respondents to represent her only at the inquest. In light of these factors, we will not disturb the trial judge's finding that respondents were discharged for good cause. This finding makes it unnecessary to review the trial judge's determinations as to fraud, solicitation, and abandonment.
Any fees to which respondents might be entitled must necessarily rest upon a theory of quantum meruit. Respondents, however, have rejected that theory as not applicable to this case, and have rested their claim to the full one-third fee upon the contract, without regard for whatever may have been the reasonable value of the services which they actually rendered. In support of this argument, they cite Goldberg v. Perlmutter, 308 Ill. App. 84, 31 NE2d 333. But that case is inapplicable here, because there the court found that the attorney seeking to enforce his lien had been discharged without good cause. Respondents not only rejected the quantum meruit theory as inapplicable, but also failed to offer any evidence in the trial court which would support a quantum meruit award, despite the fact that we remanded this case with directions to hear evidence as to the services rendered by the two sets of attorneys and to allocate the fee accordingly. As in Bremer v. Lake Erie & Western R. Co., 317 Ill. 580, 584, 148 NE 241, the evidence is clear that the respondents did not contribute one iota to the recovery of the money paid. Nothing of value has been recovered by reason of any act done or suit brought by the respondents. On the basis of this record, *97 we must conclude, as did the trial judge, that the respondents are not entitled to recover any fees.
The judgment must be affirmed.
Judgment affirmed.
KLUCZYNSKI, P.J. and MURPHY, J., concur.