**Gust Bounougias, Plaintiff-Appellant, v. Norman Peters, et al., Defendants-Appellees.**

**Gen. No. 49,275.**

First District, Fourth Division.
April 15, 1964.
Rehearing denied May 26, 1964.

John D. Vosnos, of Chicago (George A. Bosomburg, of counsel), for appellant.

Sidney Z. Karasik and Charles Wolff, of Chicago, for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Plaintiff's suit is for money which he claims was wrongfully withheld as attorneys' fees out of funds collected in satisfaction of a judgment for personal injuries. The order from which this appeal has been taken sustained a motion by defendants for summary judgment.

Plaintiff was injured in the course of his employment and retained defendant Peters to represent him in the matter of his claim before the Industrial Commission. A settlement of $7,400 was effectuated and Peters was paid a fee of 20%. Plaintiff paid all the expenses of the compensation proceedings.

During the pendency of the Industrial Commission case Peters advised plaintiff that he might have a

cause of action for the same injuries against a third party, Republic Steel Corporation. Accordingly, plaintiff signed a printed form of retainer agreement authorizing Peters to handle his claim against Republic for a contingent fee of one-third the amount realized.[1]

Suit was filed by Peters on behalf of plaintiff against Republic in the United States District Court and Republic joined plaintiff's employer, Alavina O'Malley, as a third-party defendant. Peters made arrangements with Phillips, the other defendant in the instant litigation, to try the case for the plaintiff, and after seven days of trial before a jury judgments in the amount of $105,000 were entered in favor of plaintiff against Republic and in favor of Republic against O'Malley.

Both Republic and O'Malley sought review in the Court of Appeals where plaintiff was again represented by Peters and Phillips. The judgments were affirmed and petitions for rehearing were denied.

Soon thereafter, on May 25, 1960, Peters wrote the following letter to the plaintiff:

Dear Mr. Bounougias:

This will confirm my telephone conversation with you, at which time I advised you that the

---

[1] The full text reads:

I, Gust Bounougias do hereby retain and appoint Norman Peters, as my Attorney-at-Law in the matter of my claim for personal injury received by me through the negligence of the Republic Steel Co. on the 4 day of March, 1956, and I hereby authorize my Attorney in my name to bring suit or settle, as he deems proper, by and with the advice of myself with power of substitution, hereby confirming and ratifying all that my said Attorney may do or cause to be done by virtue hereof.

In consideration of the services of my said Attorney, I hereby agree to pay said Attorney one third of whatever may be realized from said claim, and I hereby give said Norman Peters a lien on said claim to secure the payment of his fee as aforesaid.

WITNESS MY HAND AND SEAL, this 23 day of Oct. 1956.

X /s/ GUST BOUNOUGIAS (SEAL)

140

United States Court of Appeals for the 7th Circuit denied the petition for writ of error, which in simple language means that this Court will not allow a new trial. The defendants have advised us that they expect to appeal the case to the United States Supreme Court.

I would like to talk with you about the strategy that we may want to follow in this case and suggest that you be at my office Saturday morning, May 28, at 10 a. m. It is not necessary for you to bring anyone with you, for the reason that what we want to discuss will be a private matter between us.

Very truly yours,

/s/ NORMAN PETERS.

The suggested conference between plaintiff and Peters about the "strategy" to be followed in the case was held at the latter's office on the date indicated, and at this meeting "the contingent fee contract" was "renegotiated and a new contract was entered into." [2] Peters prepared and presented to plaintiff two documents for his signature and both were signed by him.[3] The first of these, in the style of a letter dated May 28, 1960, reads as follows:

Dear Mr. Peters:

In view of the fact that there was so much more litigation in my case than was anticipated at the time when I first employed you I am willing to supplement my original agreement with you and change the contingent fee from one-third to one-half of.

---

[2] The words quoted are from the answer of Peters filed in the instant case.

[3] In the form attached as exhibits to the complaint one of these documents does not bear plaintiff's signature, but it was stipulated at oral argument in this court that copies were, in fact, signed by plaintiff.

141

All of this is in consideration of the fact that since the filing of the original suit, a 3rd party action was instituted, an appeal was filed in the 7th Circuit of the United States Court of Appeals and then a Petition for Rehearing was filed which required additional briefs. And, even though all these matters were resolved in our favor, there is a possibility that the defendants will take the matter to the Supreme Court.

For this reason I am willing to sign a new agreement to cover the extra services which you are rendering, and hereby request that you use your best efforts to negotiate a settlement if possible. If you have an offer I will be pleased to cooperate with you to dispose of the matter amicably.

Very truly yours,

GUST BOUNOUGIAS.

At the bottom of this paper Peters added in longhand:

We agree to pay the expenses—

Norman Peters

5/28/60

The other document, also dated May 28, 1960, was a printed form of retainer agreement identical to that executed in 1956 (as set forth above in a footnote to this opinion) except that O'Malley's name was inserted along with that of Republic, and the contingent fee was fixed at one-half instead of one-third.

The "appeal" to the United States Supreme Court referred to in the letters of May 25th and 28th did not materialize. On June 29, 1960, however, O'Malley brought an action in the District Court to set off $10,749.65 (apparently the total amount paid to or for the benefit of plaintiff under the Workmen's Compensation Act) on the principle of an equitable credit

rather than legal subrogation. Peters and Phillips defended plaintiff against this effort to reduce the collectible amount of plaintiff's judgment, and were again successful.

Thereafter, in September, 1960 the judgment was paid in the amount of $111,556.53, including interest and costs. For a reason not explained $5,000 of this sum was not paid with the balance, the first check being for $106,556.53, payable to plaintiff, Peters and Phillips. Plaintiff endorsed the check and Peters gave plaintiff his personal checks for $55,728.26, being half of the total received and to be received. At the same time plaintiff executed a document prepared by Peters authorizing the latter to sign plaintiff's name to the subsequent check for $5,000 and keep the proceeds, "[s]ince I have this day received my share."

Plaintiff's complaint is that the second fee contract for one-half of the amount recovered was void, under the circumstances recited above, and that defendants were, therefore, entitled to a fee of one-third only; that the difference between these two figures—$18,-563.81—has been wrongfully withheld. The theory of the complaint is that there was no consideration to support the second agreement, and that it represented an unconscionable overreaching on the part of the defendants in view of the fiduciary attorney-client relationship existing between plaintiff and defendants at the time.

For all purposes pertinent here the answer of the defendant Phillips denies all the allegations of the complaint.

The answer of defendant Peters relies on the premise that the second contract superseded the original; recognizes the fiduciary nature of his relationship with plaintiff at the time of the second contract, but denies that it was breached; and states that consideration therefor is found in the extensive prior services ren-

143

dered, and in his undertaking to pay the costs and expenses of the litigation, which were in excess of $7,500. Peters' answer also avers that until the filing of this suit plaintiff had not demanded the payment to him of any additional money, but rather had expressed satisfaction with the amount he had received. In this regard Peters claims accord and satisfaction, relying on the document plaintiff signed in September, 1960, to the effect that Peters could keep the forthcoming $5,000 since plaintiff had received his share.

In support of defendants' motion for summary judgment they filed a discovery deposition of the plaintiff taken in June, 1963, and in opposition to the motion an affidavit of plaintiff was filed on his own behalf. In this affidavit it is stated that plaintiff has meager education and only a rudimentary knowledge of the English language; that on this account plaintiff had usually taken his daughter or other relative with him to defendants' office to help him understand what was said; that he had not done so on May 28, 1960, because the letter from Peters setting up the appointment had, in effect, told him not to bring anyone with him.[4]

Plaintiff's affidavit also states that he was unable to read the documents he was given to sign on May 28; that he had not known the conference was to involve a change in Peters' employment contract; that for these reasons he sought to defer signing the documents so that he might discuss them with his daughter and wife; that Peters refused him this opportunity, stating, as he had in the letter, that this was a matter between the two of them, and that if plaintiff left without signing the case would be lost.

---

[4] While it is true that the letter had not specifically instructed plaintiff to come alone, it could very well have been considered to have had that meaning. The sentence in question was: "It is not necessary for you to bring anyone with you, for the reason that what we want to discuss will be a private matter between us."

144

Plaintiff's affidavit further states that in September, 1960, when he acknowledged receipt of his share of the money he was unaware of any basis for challenge of the second contract, and, being unable to read, had no knowledge of the contents of the document he signed. At that time his daughter was present.

Plaintiff's discovery deposition is essentially consistent with his affidavit just described. It bears out rather forcefully the fact that plaintiff had difficulty understanding and speaking the English language, and he repeated under cross-examination his inability to read English. This last fact remains uncontradicted by anything in the record.

Other deposition questions elicited plaintiff's testimony that he was born in Greece in 1906 and came to the United States in 1951; that over a three-year period he had gone to see Peters many times—"Maybe fifty times"; that on two or three of those occasions he went alone, but at all other times he was accompanied by a member of his family. As he put it: "Come my daughter lot of times. Come my son-in-law lot of times. Come my cousin, the other cousin, lot of times. You know, because it is hard to explain something to me. But this day, no—no anybody because asking Mr. Peters no bring anybody."

As to the critical conversation of May 28 between plaintiff and Peters, plaintiff's deposition shows this testimony by plaintiff:

> Mr. Peters asking: Listen, Gust, you know, is the case is working, still working. I don't know it is— it is maybe going United States Supreme Court because I can't go in the United States Supreme Court because you got a lot of expenses. With the Republic Steel Company, you got a big, big lawyer and Pederson Company [Alavina O'Malley, d/b/a B. Pederson & Company], same thing. They got

the Tribune lawyer. They got the Daily News lawyer; big, big, very big. I can't go in the United States Supreme Court before put on the sign 50 per cent. This time I am stuck, you know, because I told Mr. Peters 50 per cent. Mr. Peters is give me one chance, you know. I say he is going my house. He is explaining to my wife, to my daughter, my family, anything. He come the next day for the decide. No, no, no, no, no, no, right away, put a sign. No, you wife, no you family, no anybody this is you and me. You put on the sign. No put the sign the case lose.

Q. You what? A. No put the sign on new contract, 50 per cent, it is lose the case—the case is lose. I am very scared. I am very sick. It is second time I told Mr. Peters: Mr. Peters, give me one hour go and called my wife and he say no, no, no, this is the right way. Put the sign. If no put the sign, the case is lose. I put the sign. That is all, Mr. Fasano, honest to God.

Q. And you signed the contract? A. Put a sign in the contract because you give me a chance one second. No give me a chance one second.

And, further:

Q. Mr. Peters would get 50% and you would have to pay the expenses, and didn't you tell him, "No, No, No, Mr. Peters, I will sign a 50% contract, but no expenses?"

A. No, no, no, no, no, this is wrong.

Q. You didn't say that?

A. I told—me, I told to Mr. Peters, "Mr. Peters, I put on a sign, but no more expenses." I told Mr. Peters.

Q. You told that to Mr. Peters?

A. Yes, because I don't know, maybe he can—maybe he give me more expenses. Maybe $5,000

146

more expenses. But I told, "You put it, the sign on the bottom of the contract, no expenses.(") Look at it. You got it over there, the contract.

Q. I show you now what purports to be a contract for 50%. Is this the contract you signed?

A. Yes, this is. Yes, that is right. Look at it.

Mr. Schnell: Let me see.

Q. Did Mr. Peters agree to that what you told him—a 50% contract, no expenses. Did Mr. Peters do that?

A. Mr. Peters, that is right.

Q. Did he do that?

A. Yes.

Q. Did he say that he would pay all expenses?

A. Yes. That is right, no expenses.

Q. No expenses?

A. No expenses.

The original contract was silent as to the responsibility for costs and expenses of litigation, but plaintiff understood that they were to be paid by Peters, and he so stated at three different places in his deposition. For example, the abstract of his testimony shows:

Q. What did he tell you regarding the one-third contract with regard to expenses? A. No expenses, Mr. Fasano.

Q. I mean did he tell you that? A. Yes, I told no expenses.

Q. Mr. Peters told you one-third and you wouldn't have to pay any expenses? A. Yes.

Concerning the facts relied on by defendants for accord and satisfaction plaintiff testified:

Q. The check was for $106,000, wasn't it? A. $105,000, got it Mr. Peters but the other check, is asking Mr. Peters, is still no come, on the other check. "But anyway, I give it to you in the morn-

147

ing to put it aside." No—you know, no complain, you know what I mean.

Q. No complain? A. Listen, is put a sign. I ask him, I don't know how much, seven thousand, seven hundred—$7,000, $6,000, I don't know how much. The interest—you know what I mean. I don't know how much. But, this is—altogether, altogether, give it to me check and Mr. Peters fifty-fifty five, six hundred. I don't know, something like that.

Q. He gave you a check, two checks for that or one check? A. One check.

Q. . . . And that was for one-half. A. Half.

Q. You signed a piece of paper. Is this what you signed? A. Yes.

Q. Because that check didn't come yet? A. The check not coming. The money, give it to Mr. Peters. That's all. I don't like it, Mr. Fasano.

Q. That document you signed was dated September 15, 1960 and reads, "Dear Mr. Peters: You are hereby authorized to sign my name to a check for $5,000 and to keep it as your own money since I have this day received my share" and then you signed it? A. Yes, sir.

Q. And who was with you? A. Is my daughter and my cousin.

∘ ∘ ∘ ∘ ∘ ∘

I saw Mr. Peters that day. He told me to sign the check but I refused because in addition to my name, there were the names of Mr. Peters and Mr. Phillips. I don't trust anybody. I told Mr. Peters let's go to the bank. I trust the bank.

Q. You went to see the First National Bank? A. Yes.

Q. And you saw the Vice President, or somebody? A. Yes, I go to the Vice President here.

148

■■■■■■■■

Q. You went to the First National Bank?

A. Mr. Peters, my daughter and my cousin and me.

Q. What did you do down there?

A. Go over there. Mr. Peters go by the Vice President over there. Come and explain everything. You no worry about your money. You sign. This covered the $55,000 for you. All right, I put in sign.

Q. And you signed it?

A. Yes, the check.

Q. Did you get a check from Mr. Peters?

A. Mr. Peters check.

Q. And did you deposit the check?

A. Huh?

Q. What did you do—deposit the check?

A. Deposit, that is right.

Q. Did you complain to Mr. Peters?

A. What?

Q. Did you complain to Mr. Peters about the 50%?

A. Complain?

Q. Yes.

A. No, no, no, Mr. Peters asking me, "Gust, you satisfied." I say, "I satisfied, Mr. Peters." You said 50-50, or 50% I am satisfied, yes, that is all right. I am satisfied, very satisfied." That's all right, but it's no good like that.

The order of the trial court was expressly based upon the pleadings, defendants' motion for summary judgment, and the affidavit and deposition of the plaintiff. All these documents were properly before the court at the hearing on defendants' motion and must also be considered by this court as the basis for plaintiff's appeal.

■■■ We shall first examine the record as to the case against defendant Phillips. The complaint al-

149

leges that plaintiff employed both defendants to prosecute his claim, and makes a number of other allegations against defendants in the plural form. The exhibits attached to the complaint, together with the other verified documents, however, demonstrate conclusively that both contracts were with Peters alone; that the letter of May 25, 1960, was from Peters, not Phillips; that Phillips took no part in the conference of May 28; that the transaction in September for division of the funds was between plaintiff and Peters exclusively. On the other hand, it appears affirmatively that Phillips never entered into any employment or fee agreement directly with plaintiff; that he never had any discussion with plaintiff about the second contract between plaintiff and Peters, either before or after its execution; that Phillips' only participation in the entire affair was his representation of the plaintiff in the District Court and the Court of Appeals; that after the conclusion of the court phases of the litigation he had no further contact with the plaintiff.

In the light of this recital of evidentiary detail, it appears to us that the activities of Phillips were entirely outside the relationship between plaintiff and Peters from the facts of which the issues of this case arise. Under these circumstances the broad allegations of the complaint to the contrary are insufficient to raise a "genuine issue as to any material fact," and the summary judgment in favor of Phillips is, therefore, affirmed. Solone v. Reck, 32 Ill App2d 308, 311, 177 NE2d 879; Ragen v. Wolfner, 43 Ill App2d 70, 76, 192 NE2d 560; Ill Rev Stats c 110, § 57(3).

■■ In considering the case against Peters it is urged by plaintiff, and conceded by defendant, that a contract between attorney and client is scrutinized with care and jealousy by the courts. Pocius v. Halvorsen, 30 Ill2d 73, 83, 195 NE2d 137. And this rule comes into sharpest focus when the contract in question is

entered into during the existence of this fiduciary relationship. Robinson v. Sharp, 201 Ill 86, 90, 66 NE 289. While in some jurisdictions such a contract has been declared voidable at the election of the client, we believe the better rule to be that pronounced by our courts to the effect that the contract is only presumptively fraudulent. Jordan v. The Ray Schools-Chicago, Inc., 49 Ill App2d 1, 199 NE2d 827; Awotin v. Abrams, 321 Ill App 304, 52 NE2d 827. In such a situation the attorney is in no way incapacitated from contracting with his client, but he must bear the burden of showing the utmost good faith, with complete disclosure on the part of the attorney, complete understanding of all facts and the legal consequences thereof on the part of the client, and demonstrable fairness of the agreement reached. As stated in Rose v. Frailey, 10 Ill2d 514, 517, 140 NE2d 711:

> It is fundamental that the relationship of attorney and client is a confidential one to be highly honored and guarded by the attorney. If while such relationship exists the execution of any written obligation by the client to the attorney or any instrument of conveyance by the client to the attorney appears, our courts will require that the attorney sustain the burden of proof cast upon him to show that such obligation or such conveyance was a fair one entered into by the client with full understanding and not the result of any undue influence or overreaching by the attorney.

See also Ross v. Wells, 6 Ill App2d 304, 308, 127 NE2d 519; Mansfield v. Wallace, 217 Ill 610, 622, 75 NE 682; Dyrenforth v. Palmer Pneumatic Tire Co., 240 Ill 25, 36, 88 NE 290; and ILP Attorneys and Counselors, § 65.

The question then arises as to whether the record in the case at bar sufficiently establishes defendant's meeting of this burden in the negotiations or "renegotiations" leading to execution of the second fee contract. We believe it does not. In our view the plaintiff's obvious language difficulty, his inability to read English, his customary accompaniment by a member of his family at the lawyer's office, defendant's request that he come alone on this occasion, plaintiff's rejected request for time to consider the new contract and discuss it with his family, and the absence of disclosure to or understanding by plaintiff of his legal position under the first contract and its relation to the second contract, are all matters in the record which raise genuine issues of material fact, and thus render summary judgment inappropriate. In so saying, we, of course, do not say that these questions could not be adequately answered upon trial. As indicated, however, defendant will have the burden of proof in this regard, and it is our conclusion that the record as it stands fails to eliminate the issue of whether or not defendant met the important and burdensome obligation which rested upon him under all the circumstances of this case. In the light of the indisputably excellent results achieved by counsel in this case on behalf of plaintiff in his personal injury claim, it is unfortunate that this dispute should have arisen and that this litigation should now have to proceed to trial, but we believe that a remandment for that purpose is imperative.

In such a trial it will also be incumbent upon defendant to prove consideration to support the second contract. In the record to date it appears to be lacking. The only services rendered after execution of the second contract were those relating to the equity suit by O'Malley in the District Court. Since the language of the two contracts is identical, it cannot be

152

argued successfully (as was attempted in this court) that the second contract required services of defendant in this regard which he was not already bound to perform under the first.[5] The contemplated possibility of appeal to the United States Supreme Court did not eventuate, and the past services rendered in connection with the review by the Court of Appeals must be considered as necessarily performed by defendant "in order to earn and obtain the contingent fees set forth in the [original] contract." Pocius v. Halvorsen, 30 Ill2d 73, 85, 195 NE2d 137.[6]

Because of the apparent difficulty in demonstrating consideration for the 50% contract, defendant's answer to the complaint relies on his "assumption of the obligation of the costs and expenses which were in excess of $7,500" and, in so doing, touches on hazardous ground. It may be that this payment was eventually to have been reimbursed by plaintiff, but on the extent of the record before us we would not be justified in reaching that conclusion. Whether or not this obligation exceeded that of defendant under the original contract seems also to be a question of fact since plaintiff testified that defendant agreed not just to advance but to pay the expenses in the first instance. (For the importance of this issue as bearing on the enforceability of the contract see Molthrop v. New York, C. & St. L. R. Co., 245 Ill App 8, 17; and Phillips v. South Park Com'rs, 119 Ill 626, 10 NE 230.) Assuming, however, that defendant turns out not to have been responsible for expenses under the first

---

[5] The services rendered in the equity suit may have been outside the scope of both contracts. We do not consider that question to be presented on this appeal.

[6] This conclusion was reached in Pocius despite contract language to the effect that the attorney's services would be considered as completed upon successful conclusion of the trial court proceedings.

153

contract, a very serious question, nevertheless, presents itself as to the validity of the second contract. An undertaking by a lawyer to pay litigation expenses could not furnish consideration for a fee contract because, quite to the contrary, it would render it void. Such an agreement was declared champertous as far back as Thompson v. Reynolds, 73 Ill 11, 13 (1874). And in Geer v. Frank, 179 Ill 570, 574, 53 NE 965, champerty was held to render a contract "illegal and void."

The court, in People ex rel. Chicago Bar Association v. McCallum, 341 Ill 578, 173 NE 827, a disbarment proceeding, found it ethically permissible for a lawyer holding a contingent fee contract to advance funds to his client for living expenses. In reaching that conclusion, however, it drew a parallel to the permissible advancement of costs and court charges under Canon 42 of the American Bar Association "with the understanding that the same are to be ultimately paid by the client." (Page 590.)

The full text of that canon, which has also been included in the Canons of Professional Ethics of The Illinois State Bar Association and The Chicago Bar Association, reads as follows:

> "A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, *but subject to reimbursement*." (Emphasis supplied.)

■ ■ Finally, as to defendant's contention that there was an accord and satisfaction in September, 1960, here, again, the usual legal consequences of business dealings between strangers cannot be applied when the relationship is that of attorney and client. This court held, in Henry v. Park Fire Proof Storage Co., 222 Ill App 317, 322, that the ethics involved in

154

such a relationship would permit a client to sue or defend on the merits of his claim regardless of the fact that there had been an account stated. And in Woods v. First Nat. Bank of Chicago, 314 Ill App 340, 345, 41 NE2d 235 we said that despite an account stated "[t]he burden is always on an attorney to show in the first instance that *any agreement* he has made with his client is fair, just and reasonable." (Emphasis supplied.) See also Hopkinson v. Jones, 28 Ill App 409. The primary essence of an accord and satisfaction is the accord, which requires a meeting of the minds of the parties, and, as between attorney and client, can be given no more validity than that attaching to an account stated unless the lawyer first satisfies the burden which rests upon him, as has been outlined here and in the cases cited.

The judgment of the trial court as to defendant Phillips is affirmed. The judgment as to defendant Peters is reversed and remanded for further proceedings not inconsistent with the views expressed in this opinion.

Affirmed in part, reversed in part.

McCORMICK and DRUCKER, JJ., concur.