PETER D. CORTI, Plaintiff-Appellant, *v.* RICHARD S. FLEISHER *et al.*, Defendants-Appellees.

First District (5th Division)   No. 79-197

Opinion filed February 20, 1981.

518

Sheldon Engel, of Chicago, for appellant.

Karlin & Fleisher, of Chicago (Sidney Z. Karasik, of counsel), for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

This appeal arises from an action brought by plaintiff Corti, an attorney, against defendants Karlin and Fleisher (K & F), his ex-employer law firm, and Richard S. Fleisher (Fleisher), the managing partner of the firm, based upon a written employment agreement existing between them. His three-count complaint sought the following: (1) a physical transfer of certain personal injury files referred indirectly by him to defendants along with an account of all fees generated with respect to those files subsequent to the termination of his employment; (2) a constructive trust for plaintiff's benefit on any future fees flowing from those files; and (3) an order appointing an auditor to ascertain the net profits of defendants in order to verify plaintiff's share of profits earned prior to his termination. Defendants filed a motion to dismiss alleging that the contract sued upon was "against public policy, null, void and unenforceable." On January 11, 1979, the trial court dismissed plaintiff's complaint with prejudice for its failure to state a cause of action. From this order, plaintiff now appeals.

He raises the following issues for review: (1) whether the provisions of the employment agreement upon which plaintiff's complaint were premised were void as contrary to public policy; and (2) whether the trial court erred in denying plaintiff's motion to strike defendants' motion to dismiss the complaint.

Count I of the complaint, in the nature of a declaratory judgment and accounting, stated that plaintiff was formerly employed by K & F, a partnership engaged in the practice of law. Fleisher was in control of the daily operations of K & F. Plaintiff began his employment with K & F in 1968 as a law clerk while he attended law school and continued to 1971 when he was hired, upon his graduation, as an attorney. Pursuant to an oral employment agreement extending between 1971 and June of 1976, plaintiff was to receive a weekly salary and a percentage of fees generated by cases he referred directly or indirectly (through reference lawyers secured by him) to K & F.

On December 21, 1977, a written employment agreement, retroactive to June 1, 1976, was entered into between plaintiff and defendants, which provided, in pertinent part, as follows: that the agreement was terminable at will upon written notice; that plaintiff was entitled to the greater of a yearly salary of $50,000 in 1976 and $55,000 in 1977 and years thereafter, or 20% of the firm's net profits; that upon termination of the employment agreement, all files that were directly or indirectly referred to the firm by plaintiff were to become the sole and absolute property of plaintiff and that any future fees derived therefrom were to be remitted to plaintiff.

In July of 1976, plaintiff became acquainted with a neighbor named Jason Mitan, an attorney. Due to the "business promotional campaign" of plaintiff, Mitan referred approximately 100 personal injury cases to K & F from July of 1976 to April of 1978.

The employment agreement between plaintiff and defendant was terminated on April 29, 1978.

On about May 9, 1978, Fleisher informed plaintiff that Mitan had issued written directions to Fleisher to maintain personal custody and control of any files referred by Mitan. Accordingly, defendant deemed the employment agreement with plaintiff as it related to those files to be "of no consequence and not operative," and refused to transfer the files to plaintiff or share in any fees resulting therefrom.

Count I concluded by praying for a declaration of the following: that Mitan was a reference lawyer secured by plaintiff; that cases retained by K & F which were referred to them by Mitan during the time of plaintiff's employment were "Corti files"; that Mitan had no standing to interfere with the contract rights of plaintiff and/or that Mitan is estopped from such interference; that K & F shall deliver all "Corti files" to plaintiff; and that any fees generated and received by K & F from those files shall be paid to plaintiff. Plaintiff also prayed for an accounting to be made as to the receipts and disbursements with respect to "Corti files" retained by K & F after plaintiff's termination of employment.

Count II sought the imposition of a constructive trust on funds deriving from the files in question. This was based upon defendants' abuse of the confidential relationship between them and plaintiff in unjustly retaining the "Corti files" "entrusted" to K & F under the employment agreement, and refusing to compensate plaintiff for the "wrongful, unfair and inequitable misappropriation of his files." Count II concluded by praying that the "Corti files" be held in trust by defendants for plaintiff's benefit and that defendants pay plaintiff fees derived from those files.

Count III, entitled "declaratory judgment and accounting," alleged that on June 6, 1978, plaintiff received from defendants, pursuant to the agreement between the parties, the accounting of the net profits of K & F during the period of January 1, 1978, through April 30, 1978. The employ-

ment contract additionally provided that an accounting was to be made within 30 days after the termination of plaintiff's employment. If a difference of opinion arose, an independent certified public accountant, acceptable to both parties, would make a determination of the net profits which would be conclusive on both parties.

On August 14, 1978, plaintiff informed defendant that he found their accounting unacceptable and requested his right to an audit. Plaintiff offered the names of three certified public accountants to K & F for their approval.

K & F rejected these names and submitted the names of three certified public accounting firms. These choices were "unacceptable to Corti because of his understanding that he had the right to choose the Certified Public Accountant subject to Karlin and Fleisher's reasonable review of his selection." In conclusion, plaintiff prayed for a declaration of the following: that he had the right pursuant to the employment agreement to choose the certified public accountant to conduct the audit of defendants subject to the latters' reasonable review of his selection; that defendants unreasonably rejected plaintiff's choice; and that the court select one of plaintiff's accountants or another accountant.

OPINION

Plaintiff contends that the employment agreement existing between him and defendants was legally and ethically proper, and that the complaint upon which it was based was therefore improperly dismissed.

Count I of plaintiff's complaint specifically sought to enforce paragraph 15 of the employment agreement which provided:

"In the event this Agreement is terminated * * * all open files which are at such time the property of Employer [K & F], shall remain its sole and absolute property. However, at said time, all open files referred to Employer by Corti, or reference lawyers secured by Corti (referred to herein as 'Corti files') shall become the sole and absolute property of Corti. It is the intent of the parties hereto that the owner of each file * * * shall be entitled to all fees received subsequent to the date of termination of this agreement. * * * Upon payment by Corti of such costs, expenses and advances relating to Corti files, employee shall then deliver all Corti files to Corti * * *."

Our determination of the propriety of this contractual provision compels us to decide two separate questions: (1) can an attorney lawfully enter in an agreement with his employer-law firm which provides that upon termination of employment, the attorney shall receive files of clients that he "indirectly" referred to the firm without the client's consent, and (2) can the attorney pursuant to that agreement claim all fees generated

from those files in the absence of performing legal services or assuming responsibility for handling those matters? Resolution of these questions requires an application of case law and ethical provisions dealing with the attorney-client relationship to the allegations of the complaint and the agreement at issue.

■■ With regard to the first question, it must initially be noted that plaintiff's complaint does not allege that an attorney-client relationship existed between plaintiff and the clients whose files he sought, or that those clients consented to plaintiff's "ownership" of their files. In essence, then, the plaintiff's and defendants' agreement provided for the transfer of files from defendants to plaintiff upon the latter's termination of employment without the permission of the clients. We find the agreement to be void and contrary to public policy in that it deprived the clients of their right to be represented by counsel of their own choice.

■■■ The relationship of attorney and client is a contractual one. (*Zych v. Jones* (1980), 84 Ill. App. 3d 647, 406 N.E.2d 70.) It is only created by a retainer or an offer to retain or a fee paid. (*De Wolf v. Strader* (1861), 26 Ill. 225.) It cannot be created by the attorney alone or by an attorney and a third party who has no authority to act. (*Greer v. Ludwick* (1968), 100 Ill. App. 2d 27, 241 N.E.2d 4.) According to the allegations of the instant complaint, the clients referred to as the "Corti files" shared the attorney-client relationship only with Mitan, the referring attorney and K & F, plaintiff's employer. While Mitan referred these clients to K & F as a result of plaintiff's "business promotional campaign," the complaint is devoid of any averment that plaintiff had any contact with those clients or had any agreement to represent them or that they had consented to representation by him. Plaintiff's argument that he was "cloaked with the shawl of the attorney-client relationship" by virtue of his employment with defendants is without merit. It is fundamental that the employment of one member of a law firm is the employment of all whether all are specially consulted or not, except where there is a special understanding to the contrary. (*Smith v. Brittenham* (1884), 109 Ill. 540.) This principle, however, typically finds its application in situations concerning the authority of a member of a law firm to represent a client or to contract with the client on the firm's behalf. (See 7A C.J.S. *Attorney & Client* §169.) Plaintiff cites no cases where the concept has been extended to circumstances such as these, where an employee of a firm, instead of asserting his authority to act for the clients as a representative of the firm, attempts to create an attorney-client relationship between the clients and him alone, and to depart from the firm with the clients' files without their consent to the newly created relationship. We believe that no such authority exists.

It is a basic tenet of law that a fiduciary relationship exists between an attorney and his client (*Turner v. Black* (1960), 19 Ill. 2d 296, 166 N.E.2d

588), and all transactions growing out of such a relationship are subject to the closest scrutiny. (*Gaffney v. Harmon* (1950), 405 Ill. 273, 90 N.E.2d 785; *Hamilton v. Grady* (1942), 314 Ill. App. 568, 41 N.E.2d 968 (abstract).) The courts of Illinois have given particular attention to contracts made or changed after the relationship of attorney and client has been established; it is generally held that such contracts are presumptively fraudulent. (*Miller v. Solomon* (1964), 49 Ill. App. 2d 156, 199 N.E.2d 660; *Jordan v. The Ray Schools-Chicago, Inc.* (1964), 49 Ill. App. 2d 1, 199 N.E.2d 827.) The burden of proof is upon the attorney to show the fairness of the agreement, the utmost good faith, complete disclosure on his part and a full understanding of all the facts and legal consequences on the part of the client. *Rose v. Frailey* (1957), 10 Ill. 2d 514, 140 N.E.2d 711; *Bounougias v. Peters* (1964), 49 Ill. App. 2d 138, 198 N.E.2d 142; *Goranson v. Solomonson* (1940), 304 Ill. App. 80, 25 N.E.2d 930.

Having failed to allege that the clients were aware of and consented to the agreement awarding their files to plaintiff, or that an attorney-client relationship ever existed between them, plaintiff cannot now stake claim to them as a merchant might regard goods or chattels.

Although Illinois courts have not been confronted with a problem of this precise nature, those of other jurisdictions have commented on the unique relationship existing between the attorney and client and the attendant responsibilities arising therefrom. The Supreme Court of Kansas aptly opined:

"Members of the public who seek the services of an attorney cannot be treated by him as mere merchandise or articles of trade in the market place. A client is not an article of property in which a lawyer can claim a proprietary interest, which he can sell to other lawyers expecting to be compensated for the loss of a property right." (*Palmer v. Breyfogle* (1975), 217 Kan. 128, 142, 535 P.2d 955, 965-66.)

Confronted with a situation similar to the present one, a New Jersey court found a provision in a law partnership agreement void for its failure to consider the clients' right to be represented by counsel of their own choice. In *Dwyer v. Jung* (1975), 133 N.J. Super. 343, 336 A.2d 498, *aff'd per curiam* (1975), 137 N.J. Super. 135, 348 A.2d 208, the Superior Court of New Jersey was called upon to determine the enforceability of a restrictive covenant in a partnership agreement which parceled out named clients to specific partners upon dissolution and prevented one partner from intruding upon another's clients for a period of five years. In declaring this provision in the agreement a nullity as contrary to public policy, the court stated:

"A client is always entitled to be represented by counsel of his own choosing. [Citation.] The attorney-client relationship is consensual,

highly fiduciary on the part of counsel, and he may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. [Citation.] No concept of the practice of the law is more deeply rooted. The lawyer's function is to serve, but serve he must with fidelity, devotion and erudition in the highest traditions of his noble profession." *Dwyer*, 133 N.J. Super 343, 347, 336 A.2d 498, 500.

To rule that the instant agreement is enforceable would be tantamount to condoning a lawyer's practice in exchanging clients with another member of the profession without the client's consent. We decline to do so because we believe that each person must have the untrammelled right to the counsel of his choice. A contrary decision would allow clients to be unknowingly treated like objects of commerce, to be bargained for and traded by merchant-attorneys like beans and potatoes. We now turn to the second question.

In addition to demanding the physical transfer of the clients' files, count I and count II of plaintiff's complaint sought all fees derived from the Corti files. Count I requested, "that the court order an accounting be made as to the receipts and disbursements with respect to Corti files retained by Karlin and Fleisher after Corti's termination of employ [*sic*]." Similarly, count II prayed for the imposition of a constructive trust upon the files for plaintiff's benefit and that the "Defendants be directed to turn over and pay to the plaintiff equitable and just compensation from the fees the defendants derive from the Corti files." Whether couched in terms of an "accounting" or a "constructive trust," plaintiff simply demanded all fees generated from cases which were "indirectly" referred to defendants by plaintiff's acquaintance. Plaintiff did not support this claim with any allegations that any attorney-client relationship existed between him and the clients, or that he rendered legal or other services with respect to the files other than his introduction of Mitan, the referring attorney to K & F, his employer. Viewed against this background, we find that plaintiff is entitled to no fees since the provision in the agreement is violative of public policy.

In reaching this decision, we have concluded that the agreement is injurious to the best interests of the clients concerned because it reduces the motivation of defendants to use their best efforts in resolving the clients' cases. According to paragraph 15 of the agreement, plaintiff was entitled to the ownership of all Corti files along with all fees received subsequent to the termination of his employment. We have already determined that plaintiff is not entitled to the files since he failed to secure the clients' consent for their transfer. His remaining request is for fees derived from files in which subsequent to his employment he did not and could not have done any work. Consequently, if this agreement were

enforceable, defendants would be required under paragraph 15 to perform all the legal work on these files and then to remit all fees to plaintiff who "earned" them solely by indirectly referring the files to defendants. In our view, it defies common sense to believe that defendants would be inclined to give the clients under these circumstances the same caliber of professional treatment that they would render to a client originating from their office. Defendants, instead, would be encouraged to dispose of the matters as quickly as possible without regard to the clients' best interests, realizing that all fees arising therefrom would accrue to plaintiff, who rendered no services and assumed no responsibility for the files. We will not lend judicial approval to an agreement of this nature, because it endangers the clients' right to receive their attorneys' complete care and consideration in the disposition of their legal affairs.

Cases from other jurisdictions, while taking slightly different approaches to this problem, join in our conclusion that an attorney may lawfully agree to share fees with another only for providing legal services or assuming responsibility on a case. As will be discussed, these cases focus on the adverse effects that such fee-sharing agreements have on the legal profession rather than the client. While the enforcement of agreements of this kind is detrimental to the reputation of the profession in the eyes of the public, their actual effect on the clients themselves is our paramount concern. Before analyzing those cases from other jurisdictions which bolster our determination that these agreements are unenforceable, we first look to case law from this State.

Illinois law concerning the enforceability of agreements between attorneys for the division of fees in referral cases is scarce and can only be deemed inconclusive. Our research reveals three cases dealing with this topic.

The earliest case, *Parker v. Gartside* (1913), 178 Ill. App. 634, involved an action by a Seattle attorney against two attorneys in Chicago for a division of fees in a collection case referred to defendants by plaintiff. The trial court entered judgment for plaintiff, the referring attorney, for $47.33. Defendants contended that the trial court erred in admitting testimony proving that a general custom prevailed for collection referral cases in which the referring attorney earned one-third of the fees, with the remaining two-thirds accruing to the recipient attorney. The court held that the evidence was admissible. This case is distinguishable from the present case and is of little aid in resolving the matter before us. First, plaintiff's claim for fees in *Parker* was supported by evidence that he had performed "certain services on the case" in addition to its mere referral. Second, it was undisputed that plaintiff had an attorney-client relationship with the client whose case was forwarded. Third, the recipient attorney, the court found, acted pursuant to both plaintiff's direction and

authority and the client's knowledge in proceeding on the collection. By admitting the testimony in question into evidence, the court simply provided a mechanism for the division of fees on a case where both attorneys had performed services, but had no written agreement to determine the method of apportionment.

In *Monahan v. Heirich* (1955), 4 Ill. App. 2d 373, 124 N.E.2d 39 (abstract), the court enforced an agreement between two attorneys "associated" in the practice of law for the division of legal fees without reference to or consideration of the proportionate sharing of services or responsibility for the case referred. The parties had agreed that if the defendant became associated with the plaintiff in any personal injury cases or other matters which were the "business" of the plaintiff the fees would be divided equally. Subsequently, in response to a call from a relative of a person injured in a railroad accident, plaintiff met the relative at the hospital but could not see the patient since visiting hours were over. After discussing the case with the relative, plaintiff, who was leaving town on vacation, called defendant and requested him to return there the next day to have the patient sign a retainer hiring them. Later, a retainer agreement was signed, but did not include plaintiff. After preparing the case for trial, defendant negotiated a settlement on behalf of the injured party for $45,000.

The appellate court found that the master's findings of fact and conclusions, that the personal injury case was "law business" belonging to plaintiff, were not contrary to the manifest weight of evidence, and affirmed the circuit court's order that awarded one-half of the fees to plaintiff according to their agreement. In addition, the court rejected defendant's argument that plaintiff was precluded from recovery under Canon 34 of the Canons of Professional Ethics of the American, Illinois and Chicago Bar Associations which provided that "no division of fees for legal services is proper, except with another lawyer based upon a division of service or responsibility." The court reasoned that the parties' agreement "envisioned a division of services or responsibilities." This conclusion was buttressed by the court's finding that there was also a division of services or responsibilities in other cases in which the parties were associated.

In *Monahan*, the court was not squarely presented with the question of whether an attorney can earn a fee for merely referring a case. In addition, the court gave perfunctory treatment to the issues involved and failed to supply sufficient facts to explain its ruling. For instance, no explanation was given of the relationship between the code of ethics and the legal issues surrounding the fee-sharing agreement. Also, there was no description of how the parties were "associated" in the practice of law, or how their agreement or past agreements envisioned a division of service

or responsibility. For these reasons, we find *Monahan* to be unsatisfactory precedent.

More recently, the First District of the Illinois Appellate Court in *Kravis v. Smith Marine, Inc.* (1973), 15 Ill. App. 3d 494, 304 N.E.2d 720, *reversed* (1975), 60 Ill. 2d 141, 324 N.E.2d 417, denied a referring attorney's claim for fees stemming from a personal injury action. In *Kravis*, an attorney was contacted by Kravis to handle probate and insurance matters following a boating accident which took the life of Kravis' wife and unborn child and left his young son permanently disabled. No fee arrangement was made between the two for this work. Thereafter, the original attorney referred the matter to a second attorney specializing in personal injury litigation. After conferring with Kravis, the second attorney was retained. The attorneys, without Kravis' knowledge, agreed that the original attorney would receive two-thirds and the second, one-third of any fee earned. Later, the second attorney withdrew and a third attorney was retained as co-counsel pursuant to an undisclosed intra-attorney agreement to share equally in any fee generated. At this point, Kravis signed a retainer agreement to employ the latest duo in return for the "statutory fee" allowed (25% of a total settlement amount and 33 1/3% of recoveries resulting from trials). Two years later, a partial settlement was reached, and the original attorney requested his share in the fee, which he described as "customary." Kravis, astonished, formally terminated the original attorney and requested the court to find the attorney's services to be of no value, alleging that a breach of ethical standards had occurred. Following a hearing, the trial court found that Kravis had ratified the original attorney's conduct and that the latter had rendered valuable legal service.

On appeal, the Illinois Appellate Court held that the original attorney actively participated in the litigation with the knowledge of Kravis and deserved remuneration on a *quantum meruit* basis. However, the attorney was also found to have violated the attorney-client relationship by failing to inform and obtain the consent of Kravis before entering into the fee agreements with the second and third attorneys.

The Illinois Supreme Court reversed the decision of the Illinois appellate court and reinstated the trial court's decision. (*Kravis v. Smith Marine, Inc.*, (1975), 60 Ill. 2d 141, 324 N.E.2d 417.) Relying upon a principle of appellate review mandating that an issue not presented at the trial court cannot be raised for review, the court found that the question of nondisclosure to Kravis of the fee arrangement between the original and second attorney was improperly considered by the appellate court. In addition, the court stated that Kravis knew or should have known of the fee arrangement between the original and third attorney based upon the written retainer agreement executed between the three. Because Kravis

was fully advised of all material matters relating to the attorney-client relationship and the original attorney had expended time and money in handling the legal matters following the accident, the court held that he was entitled to fees according to the written agreement.

The *Kravis* decisions, thought not dispositive of the present problem, are of interest for two reasons. Recognizing the fiduciary relationship that exists between an attorney and client, they analyzed the claimant's demand for fees under the intra-attorney fee agreement in terms of whether the client was informed and consented to the arrangements and whether actual services were performed to earn the fee.

In summary, none of the Illinois cases answers the present issue of whether an attorney can lawfully contract with another member of the profession to receive all fees generated from clients' files based upon the mere referral or "indirect" referral of them. While each apparently recognizes that agreements allowing a division of fees between attorneys can be proper, no guidelines are set forth as to determining the circumstances under which they are allowed. The common thread running through each, though not explicitly elucidated, appears to be that an attorney must perform services or exercise some degree of responsibility other than the mere referral of a case.

Problems concerning intra-attorney fee-sharing agreements are complex. They involve questions of law and professional responsibility. For this reason, and because of the paucity of pertinent authority in our State, we find it necessary to now turn to the law of other jurisdictions.

A review of case law from other jurisdictions, as earlier stated, reveals several different approaches to the resolution of problems of enforcing fee-sharing arrangements between attorneys. Regardless of the approach taken, they concur in the conclusion that fee sharing is prohibited when there has been absolutely no sharing of services or responsibilities. (See generally Hall and Levy, *Intra-Attorney Fee Sharing Arrangements*, 11 Val. U. L. Rev. 1 (1976).) In denying claims for referral fees, some courts have relied upon principles of substantive law. For instance, some forums have based their reasoning upon contractual concepts such as lack of consideration (*Swacker v. Penrod Corp.* (1947), 30 Del. Ch. 495, 57 A.2d 63) or failure of one contracting party to contribute to the services performed, thereby abrogating the obligation placed upon him pursuant to a bilateral contract. (*Doherty v. Ginsberg* (1963), 346 Mass. 421, 193 N.E.2d 677.) The analysis employed in these cases is inadequate, because it does not consider the uniqueness of the legal profession and problems flowing from the attorney-client relationship.

The courts of New York, rather than restricting their approach to the area of substantive law alone, have elevated certain ethical proscriptions

to the status of substantive law as reflective of public policy. In 1937, a New York Supreme Court decision held that an attempt to enforce a contract for a "commission" based upon a referral of a legal matter contravened New York public policy. (*Clark v. Robinson* (1937), 252 App. Div. 857, 299 N.Y.S. 474.) Indeed, the courts of that State have required that an attorney's complaint, to be viable, must allege that the cause of action for the sharing of fees is based upon the actual division of services or responsibility in the handling of the underlying legal matters. *Silver v. Paulson* (1955), 285 App. Div. 1059, 139 N.Y.S.2d 456.

A 1958 Missouri Court of Appeals decision boldly attempted to combine ethical guidelines with a specific factual situation in determining the definition for the "services" or "responsibilities" required of an attorney as a prerequisite to earning a fee. (*McFarland v. George* (Mo. App. 1958), 316 S.W.2d 662.) In *McFarland*, the court explicitly pronounced that the mere referral of a case by one lawyer to another, without further participation in the case, cannot be construed as performing service or discharging responsibility in the case. There, an attorney, McLaughlin, claimed a portion of a fee allowed by a probate court to another attorney, Lovell, which resulted from a will contest. While McLaughlin asserted that he and George agreed to jointly represent an incompetent in her efforts to contest her aunt's will, George maintained that McLaughlin's claim was based solely upon his referral of the incompetent to George. Following McLaughlin's death, the trial court awarded one-third of the fee earned to his administrator. On appeal, George contended that the trial court erred in implying a promise to share any fees. He relied upon Missouri Supreme Court Rule 4.34, derived from Canon 34 of the American Bar Association Canons of Professional Ethics. Rule 4.34 provided:

> "No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility."

The Missouri Court of Appeals initially noted that it had "some doubt" that the legal concept of "joint adventure" and "special partnership", terms used by McLaughlin to characterize his association with George, could be applied to an agreement in which lawyers associate professionally to represent clients. Further, the court found that McLaughlin had presented no evidence showing the assumption and discharge of responsibility in the handling of the will contest, in violation of Rule 4.34, and was therefore entitled to no fee. In reaching this conclusion, the court relied in part upon certain comments by Henry S. Drinker, author of a book on legal ethics, in a panel discussion reported in 7 University of Florida Law Review 433, 434 (1954), which read:

> " 'It makes the law too much of a business if you are practicing the way you would as a broker. The lawyer is not supposed to get paid

for anything but the legal services that he renders, and selling a man a client is not a legal service.' " (*McFarland*, 316 S.W.2d 662, 671.)

The court concluded by attempting to define the actual meaning of "service" and "responsibility" within the context of Canon 34 and the rule of its State by offering the following:

"The primary meaning of 'responsibility' as found in the dictionaries is the state of being answerable for an obligation. [Citation.] The term 'responsibility' includes judgment, skill, ability and capacity. [Citation.] Legal responsibility is the state of one who is bound or obliged in law and justice *to do something.* [Citation.] * * * The word 'responsibility' as used in the rule means the doing of something. Any other meaning would render the rule meaningless." (*McFarland*, 316 S.W.2d 662, 671.)

Based upon the fee agreements' noncompliance with Rule 4.34, which regulated the conduct of Missouri attorneys, relief was denied to McLaughlin.

More recently, a new Code of Professional Responsibilities was adopted by the House of Delegates of the American Bar Association in August of 1969, with the intention of providing a complete embodiment of legal ethics in one reference source. (See generally Sutton, *Symposium—The American Bar Association Code of Professional Responsibility*, 48 Tex. L. Rev. 255 (1970).) With respect to the issue of fee splitting among attorneys, Disciplinary Rule 2—107 (DR 2—107), the successor to Canon 34, requires that a division of fees be based upon the sharing of services and responsibilities. DR 2—107 reads:

### "DIVISION OF FEES AMONG LAWYERS

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his firm or law office, unless:

(1) the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) The division is made in proportion to the services performed and responsibility assumed by each.

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

(B) This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement."

The applicable companion Ethical Consideration (EC 2—22) to this provision likewise proscribes:

"Without the consent of his client, a lawyer should not associate in

a particular matter another lawyer outside his firm. A fee may properly be divided between lawyers properly associated if the division is in proportion to the services performed and the responsibility assumed by each lawyer and if the total fee is reasonable."

Opinions rendered by the American Bar Association's Standing Committee on Professional Responsibility provide some guidance on the propriety of dividing fees solely for referral. In Informal Opinion 1239, issued June 2, 1977, the Committee stated that it was improper when no "appreciable" service had been performed or when no responsibility had been assumed. On June 2, 1977, the Committee stated in Informal Opinion 1392 that it was improper to divide fees solely for referral. This view has been adopted by the leading case which interprets DR 2—107.

In *Palmer v. Breyfogle* (1975), 217 Kan. 128, 535 P.2d 955, the Kansas Supreme Court rejected plaintiff's claim for a portion of fees resulting from his referral of a divorce case to other attorneys. This claim was premised upon a county bar association's minimum fee schedule which allowed local counsel to share in the fees without active participation in the case. The court found that plaintiff had failed to perform legal services or assume any responsibility on the case within the meaning of DR 2—107 even though he had originally acquired the client and allegedly attempted to "keep her happy" while the litigation was in process. In denying relief to the attorney, the court concluded by expressing disbelief that the claimant, in a suit of this kind, was unable to state the nature of the services which he performed and the professional time and effort expended in providing those services.

DR 2—107 of the American Bar Association Code of Professional Responsibility has been adopted, in toto, by the Illinois and Chicago Bar Associations and renumbered as Disciplinary Rule 2—108 (DR 2—108).[1] Both parties in the present case recognize the relevancy of the provision to the assessment of fee-sharing arrangements, but have differing interpre-

---

[1] Subsequent to this controversy, the Supreme Court of Illinois adopted the Illinois Code of Professional Responsibility, effective June 3, 1980, which was modeled after the ABA Code of Professional Responsibility. DR 2—107 of the new Illinois Code departs from its parallel section under the ABA Code by providing that fee-sharing by a referring attorney is permissible even if that attorney takes no part in the actual handling of the case, so long as the referring attorney assumes responsibility for the work as though he were the other's partner and the total fee of the attorneys does not exceed reasonable compensation for the legal services performed. (See 1980 Illinois Code of Professional Responsibility, Committee Commentary, at 16.) In the past, referring attorneys had been given make-work tasks after referral in order to earn a fee. In light of these practices, this provision was adopted in an effort to encourage attorneys to refer matters to those more skilled in a particular area on condition that full disclosure was made to the client and responsibility was maintained by the referring attorneys. (Committee Commentary, at 16.) This section has no application to the instant appeal since it was enacted subsequent to the execution of the employment agreement. Moreover, it does not sustain plaintiff's position, as plaintiff failed to disclose the fee-sharing arrangements to the clients and assumed no responsibility for their files.

tations concerning its application here. Defendants contend that the general rule, DR 2—107(A), is inapposite since plaintiff failed to allege that the clients consented to his employment, or that he rendered them any legal services or assumed responsibility for their files. Plaintiff, on the other hand, maintains that the exception to that provision, DR 2—107(B), controls this case, since the present agreement is merely a separation agreement between members of a law firm. DR 2—107(B) provides:

> "This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement."

We find that this exception does not provide support for the enforceability of the present fee-sharing agreement. In our opinion, DR 2—107(B) sanctions payment to a former partner or associate of a law firm for legal services which contributed to the firm's overall profits. Invariably, a portion of those profits and the corresponding payments to the attorney may have derived from files upon which the departing employee rendered no actual services. This practice, however, is permissible for two reasons. First, the compensation is not directly linked to the particular files, so the employee is not rewarded for soliciting the clients' employment or failing to perform services for them. Second, and more importantly, the clients are not affected by this arrangement and continue to receive the firm's best skills and abilities after the employee's termination of employment. If applied to the particular agreement, however, this section would condone an opposite result. Because the compensation under the provision in question is exclusively tied to the referred files instead of the firm's general profits, plaintiff would actually be rewarded for simply being a link in the chain which led to the clients' referral. In addition, the client's best interests would suffer since the motivation of the firm to render them quality legal services would be substantially reduced, since *all* fees resulting from their files were promised to plaintiff, the departing employee, under the agreement.

It is evident from this review that attorneys have long been ethically and legally prohibited from sharing with other members of the profession fees generated from the disposal of a legal matter when the only "service" rendered by the claimant attorney is the referral of the case. Profiting from the solicitation of professional employment is injurious to the legal profession and to the public. As the various authorities reveal, this practice is injurious to the legal profession since the public loses confidence in those who treat clients as merchandise in a market place rather than the recipients of the attorneys' skills and abilities. More importantly, the best interest of the clients is jeopardized by the arrangements when it becomes more profitable for attorneys to sell clients than to give them a legal service. The unique terms of the present agreement *not only* permitted plaintiff to profit from the mere indirect referral of personal

injury cases, but also diminished defendants' incentive to provide the clients with the time and effort that their cases merited. As such, the relevant provision in the agreement is contrary to public policy. Therefore, counts I and II of plaintiff's complaint were properly dismissed.

Plaintiff also contends that the trial court erred in denying his motion to strike defendants' motion to dismiss the complaint. This contention is comprised of three separate arguments.

■■■ The first argument is that defendants should have been equitably estopped from challenging the validity of the employment agreement by way of their motion to dismiss the complaint because they accepted substantial income derived from cases indirectly referred to them by plaintiff. Where enforcement of an illegal contract is sought, the courts will aid neither party but will leave them where they have placed themselves, since the parties are in *pari delicto*, and can recover nothing under the contract. (*Merchandise National Bank v. Kolber* (1977), 50 Ill. App. 3d 365, 365 N.E.2d 688.) For the reasons discussed, the agreement between the parties is illegal (contrary to public policy) and will not be enforced regardless of the "benefits" flowing to defendants from their retention of the files.

As a corollary to this argument, plaintiff maintains that defendants should have been ethically estopped from challenging the fee agreement. The American Bar Association Standing Committee on Professional Responsibility stated in Informal Opinion 870, issued August 4, 1965:

> "An attorney who made an arrangement for the division of fees (which arrangement in the first instance was unethical) should not thereafter interpose as a reason for not carrying out the agreement that it was unethical."

This opinion is of no aid to plaintiff's position. The Code of Professional Responsibility is not binding on courts, but does constitute a safe guide for the professional conduct of attorneys. (*In re Taylor* (1977), 66 Ill. 2d 567, 363 N.E.2d 845.) While not binding on this court, we generally find relevant ethical provisions and informal opinions persuasive authority for resolving problems of this nature because the standards they establish for attorneys' conduct ultimately affect the clients they serve. Indeed, ethical provisions have served as the basis of decisions upon which we have relied, in part, for invalidating the fee agreement in this case. We have consistently maintained, though, that we are primarily concerned with the effect of such unlawful agreements on the clients. Informal Opinion 870 deals with the agreements' effect on the parties to the contract, not on the clients. Therefore, application of principles of estoppel under these circumstances is unwarranted. We also briefly dispose of plaintiff's assertion that defendants are estopped from challenging the employment agreement on the basis that they changed their

grounds for performing the agreement after litigation commenced. Our review of the record shows that defendants consistently justified their nonperformance on the basis that the agreement was void as contrary to public policy.

Plaintiff's second argument is that the motion to dismiss the complaint improperly raised factual defenses concerning the agreements' unenforceability by creating questions with respect to the existence of an attorney-client relationship between plaintiff and the clients, and the clients' awareness of the fee agreement. We find that these particular "questions" did not introduce factual issues, but correctly revealed that plaintiff's complaint was deficient for its failure to allege essential elements of the cause of action for the transfer of files and division of fees. The motion to dismiss was therefore in conformity with section 45 of the Illinois Civil Practice Act. Ill. Rev. Stat. 1977, ch. 110, par. 45.

■■ The third argument is that the motion to dismiss the complaint lacked specificity and was directed exclusively at count I of the complaint, which prayed for the physical transfer of the files. Thus, plaintiff asserts that the entire complaint was improperly dismissed since the motion to dismiss did not focus on count II, requesting the imposition of a constructive trust on the fees for plaintiff's benefit or on count III, asking that an auditor be appointed to determine the monies due plaintiff during the term of his employment. We find that the motion to dismiss adequately embraced count II of the complaint since it alleged that the contract sued upon is contrary to public policy. Defendants were not required to specifically direct their motion to count II, which requested relief under a different theory which, if granted, would also have been against public policy. Furthermore, even if the deficiencies in count II were not addressed by the motion to dismiss, this court, *sua sponte*, can consider the question of the agreements' illegality (*Callen v. Akhter* (1978), 66 Ill. App. 3d 421, 384 N.E.2d 42.) Therefore, counts I and II were properly dismissed. As to count III of the complaint, the motion to dismiss sufficiently alluded to its unenforceability since the motion alleged the employment contracts' illegality, and count III sought relief under the terms of the agreement. Although it was properly addressed by defendants' motion to dismiss the complaint, we find that the trial court erred in dismissing count III.

■■■ In our opinion, count III requested the enforcement of part of the employment agreement that is severable from the portion of the contract that we have found illegal. Generally, if the legal portion of a bilateral contract is severable, legal promises on one side being wholly supported by legal promises on the other, and the illegal portion of the contract does not go to its essence, the legal part may be enforced. (See 15 Williston on Contracts §1782 (3d ed. 1972).) Furthermore, courts will enforce valid parts of partially unlawful contracts, even in the absence of a severability

534

provision. (*Sealy Mattress Co. v. Sealy, Inc.* (N.D. Ill. 1972), 346 F. Supp. 353.) Count III of the complaint was concerned with the interpretation of a provision in the employment contract dealing with the right to choose an auditor to determine the firm's net profits from the date of the previous accounting to the date of the termination of plaintiff's employment. From these and other profits, plaintiff was to be compensated under the terms of the agreement for legal services rendered. This compensation was separate from and unrelated to fees generated from the Mitan files, under the provision of the contract that we have found unenforceable. Because the portion of the contract sought to be enforced under count III concerned promises on one side (*i.e.*, the tender of a percentage of net profits) wholly supported by legal promises on the other (*i.e.*, the rendition of legal services), this legal portion was severable from the other and was therefore improperly dismissed.

In summary, we hold that counts I and II of the complaint were properly dismissed by the trial court's order because they sought to enforce a provision in the employment agreement that contravenes public policy. Count III of the complaint was improperly dismissed, as it dealt with separate, lawful provisions of the agreement.

For the reasons stated, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; remanded.

SULLIVAN, P. J., and WILSON, J., concur.